# IN THE SUPREME COURT, STATE OF WYOMING

## 2015 WY 13

### OCTOBER TERM, A.D. 2014

### January 23, 2015

|  |  |
|---|---|
| WILLIAM C. FORBES and JULIA FORBES, Trustees of the Beckton Ranch Trust U/A/D April 1, 1920, <br><br> Appellants <br> (Defendants), <br><br> v. <br><br> WALDO E. FORBES, <br><br> Appellee <br> (Plaintiff). | S-14-0122 |
| WALDO E. FORBES, <br><br> Appellant <br> (Plaintiff), <br><br> v. <br><br> WILLIAM C. FORBES, JULIA FORBES, EDITH L. FORBES, and SARAH FORBES, Trustees of the Beckton Ranch Trust U/A/D April 1, 1920, <br><br> Appellees <br> (Defendants). | S-14-0123 |

*Appeal from the District Court of Sheridan County*
*The Honorable William J. Edelman, Judge*

*Representing William C. Forbes and Julia Forbes in Case No. S-14-0122:*
    Patrick J. Murphy and Keith J. Dodson, Williams, Porter, Day & Neville, P.C., Casper, Wyoming.  Argument by Mr. Murphy.

*Representing William C. Forbes, Julia Forbes, Edith L. Forbes, and Sarah Forbes in Case No. S-14-0123:*
    Patrick J. Murphy and Keith J. Dodson, Williams, Porter, Day & Neville, P.C., Casper, Wyoming.  Argument by Mr. Murphy.

*Representing Waldo E. Forbes:*
    Debra J. Wendtland, Wendtland & Wendtland, LLP, Sheridan, Wyoming.

*Before BURKE, C.J., and HILL, KITE, DAVIS, and FOX, JJ.*

**NOTICE:  This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**FOX, Justice.**

[¶1]     The Beckton Ranch Trust (BRT) was formed in 1920 by six members of the Forbes family to hold certain parcels of land and their appurtenant water and ditch rights in Sheridan County, Wyoming, for the benefit of their descendants.  The number of beneficiaries grew over time to 19, but the Forbes family managed the Trust's interests without significant strife.  That changed in 2007, when Waldo E. Forbes (Spike) resigned as trustee following a dispute with his siblings.  Later that year, the remaining trustees—Spike's brother, William Forbes (Cam) and his sisters, Julia Forbes, Sarah Forbes, and Edith Forbes—began a series of land and water transactions that form the basis for the breach of the duty of loyalty alleged in the complaint Spike filed against them.

[¶2]     After a bench trial, the district court found that two of the four trustees, Cam and Julia, had breached their duty of loyalty and should be removed.  The district court made no finding regarding Sarah and Edith, and did not remove them as trustees.  Both sides appeal.  We reverse the district court's order removing Cam and Julia, and affirm the decision not to remove Sarah and Edith.

## *ISSUES*

[¶3]     Cam Forbes and Julia Forbes, Trustees of the BRT, raise the following issues on appeal:

1.     Was the district court's decision to remove Cam and Julia as trustees because of the exchange of water rights reversible error because it was based on an unpled claim and because it made clearly erroneous findings regarding the exchange of water rights?

2.     Was the district court's finding that Julia profited from the transactions that were undertaken to place a conservation easement on the BRT property clearly erroneous?

3.     Did the district court err when it found that Cam and Julia improperly issued new shares in the BRT?

4.     Did the district court commit reversible error when it allowed undesignated expert testimony, concluded property deeded to Cam was not suitable for development in spite of Spike's expert's testimony otherwise, and based its finding on difference in value by comparing a 2007 value of one property to a 2013 value of another?

5.     Did the district court commit reversible error when it failed to address the BRT Trustees' affirmative defenses?

1

[¶4]    Spike raises only one issue in his cross appeal:

1.    Did the district court err as a matter of law when it failed to remove Edith and Sarah as trustees of the BRT?

## FACTS

[¶5]    The BRT is a Massachusetts Business Trust created by members of the Forbes family in 1920 to manage and hold real property in Sheridan County, Wyoming, for the benefit of the Forbes family and their descendants.  The BRT holds approximately 6,000 acres of land worth roughly $20,000,000.  Spike was a trustee of the BRT for approximately 44 years, from 1963 until 2007.  Cam became a trustee in 1983, Edith in 1986, and Julia and Sarah in 2007.  There are 19 beneficiaries of the BRT, including Spike, Cam, Edith, and Julia.[1]  Spike is the only beneficiary to challenge the trustees' exercise of their duties.  The BRT will terminate 20 years after the death of Amelia Forbes, who was born in 1915, and was alive at the time of the hearing.[2]

[¶6]    Other Forbes family entities that enter the picture are the Hillside Street Trust (HST), which owns land in the same area as the BRT; the Sarah P. Forbes Revocable Trust (SPFRT), which held the family home sometimes referred to as the "Cave Creek property;" Beckton Stock Farms, Inc., which operates a cattle business on BRT and HST land; and Beckton Livestock, LLC, which owns the livestock that is operated by Beckton Stock Farms.  Each of these entities has overlapping, but not identical, beneficiaries, trustees, officers, and members.

[¶7]    The stage for the current dispute was set with the aging and estate tax concerns of the generation now managing the BRT; the death of their mother, Sal Forbes; the retirement of Spike as ranch manager and BRT trustee; and the looming termination of the Trust.  Spike, who had become disgruntled after a difference of opinion with his siblings over remodeling and construction expenses for the Cave Creek house he lived in with Sal, and who had concluded that "my own estate planning imperatives required some ownership separation," made it clear that he would be taking any steps necessary to separate his interests from the Trust.  In a May 6, 2011, email to Edith, he said: "That can happen in a way which is mutually beneficial to many shared common interests, or it can happen with a fight every step of the way."  He went on to say: "The choice on 'how' it happens is in your camp: cooperatively or with fight after fight."  On July 11, 2011, Spike filed the complaint that began this lawsuit.

---

[1] Sarah Forbes is not a BRT beneficiary.
[2] The Trust may also be terminated earlier at the discretion of three or more trustees.

## A. The 2007 "Cam transaction"

[¶8]    While Spike was still a BRT trustee, in January 2007, he proposed that:

> It is appropriate that Cam own the land upon which his house sits, currently owned by the Beckton Trust.  I propose that such land be sold to him by the Beckton Trust at the current fair market value established by the County which is approximately $25,000 for the home-site plus a small amount for the adjacent agricultural land.

[¶9]    In August 2007, after Spike had resigned as trustee, the BRT exchanged the property on which Cam had built his house for a 31 percent interest in 80 acres of property Cam owned near Sheridan, the "Jeffries 80."  A 2007 appraisal of the property Cam acquired from the BRT valued it at $320,000.  A 2007 appraisal of a 35-acre "hypothetical piece of property"[3] owned by Cam valued it at $454,000.  The Jeffries 80 that was ultimately exchanged to the BRT was near, but "not exactly contiguous" to the land appraised in the 2007 appraisal.  A 2013 appraisal, obtained by Spike for this litigation, valued the Jeffries 80 at $205,000 (31 percent of that value is $63,550).

[¶10]  Trustee Sarah Forbes explained that the trustees concluded this land exchange was in the BRT's interest because the Jeffries 80 seemed to be "premiere land" for development, and because it would be beneficial for the trust to have land that could be sold without impacting the ranch operations.  They also believed that the 31% interest would be beneficial because they could "ride on Cam's coattails" when he developed the property.  Spike's expert James Urbatchka, who performed both Jeffries 80 appraisals, testified that "I think there was enough relatively flat land that you could put four houses there."

[¶11]  Cam recused himself from the August 27, 2007 Resolution of the BRT trustees that adopted the Jeffries 80 exchange.  However, he was fully involved in the discussions and planning leading up to that point, retaining Mr. Urbatchka to do the appraisals for both properties, and making several trips over the Jeffries 80 with other BRT trustees and beneficiaries.

## B. The Cave Creek Transaction

[¶12]  In 2010, when the matriarch Sal Forbes was ill, the trustees determined that the BRT should acquire her house and property, known as "Cave Creek," in an attempt to keep that property in the family after her death.  To accomplish this, the BRT acquired

---

[3] The hypothetical aspect of the appraisal was that it was to value 35 acres out of 1,500 acres that Cam owned, without identifying which 35 acres.

the house and 72 acres, valued at $1,233,000, in exchange for 70 newly-issued shares in the BRT. Neither the Cave Creek transaction nor the issuance of 70 new BRT shares for that transaction were relied upon by the district court in its Findings of Fact, Conclusions of Law and Judgement [sic].

## C. The Conservation Easement Exchange

[¶13] Spike testified that "[w]e started talking about a conservation easement and encouraging it in 2005 while I was a trustee." Many BRT beneficiaries had indicated a desire to preserve BRT land with such an easement. In 2010, the BRT trustees reached an agreement with the Nature Conservancy to place a conservation easement on 1,020 acres of BRT land, in exchange for $1,353,200 (net after taxes and costs) and a small piece of property called the "Polo Field." Spike was in favor of this transaction; however, he objected to a series of transactions between trustee Julia Forbes and the BRT which led up to the conservation easement transaction.

[¶14] Late in the negotiations on the conservation easement, which were to be resolved by the end of 2010 due to funding restrictions, the trustees learned that the Natural Resources Conservation Service (NRCS) would require all 19 BRT beneficiaries to be assessed for financial eligibility pursuant to 7 C.F.R. § 1491 *et seq*. prior to approving the easement. In order to avoid the cumbersome eligibility assessment and expedite the process, the trustees determined to convey the property to one person, trustee Julia Forbes.

[¶15] The idea that Julia would hold the 1,020 acres subject to the conservation easement for purposes of the transaction was fairly straightforward; however, Julia did not own sufficient shares in the BRT necessary to exchange for that amount of acreage. In order to acquire sufficient shares, Julia first exchanged 61 shares she had in the HST for 320 acres of HST land. Then, in order to acquire more BRT shares, Julia exchanged the 320 former HST acres to the BRT for 60 newly-issued BRT shares. Julia then relinquished her 210 BRT shares in exchange for 1,020 acres of BRT land. She completed the conservation easement deal as the sole owner of the 1,020 acres, and then transferred that land back to the BRT in exchange for 172 BRT shares. She also conveyed to the BRT the $1,353,200 (net after taxes and costs) that she had received for the easement. Julia still retains the Polo Field property which was also part of the easement consideration, pending resolution of this lawsuit.

[¶16] The trustees did not obtain any current appraisal of the specific pieces of property exchanged in this series of transactions (other than the appraisal of the 1,020 acres for the conservation easement), instead relying on older appraisals, appraisals of other property in the area, and a 2004 market analysis.

4

**D. The Petitions for Change of Place of Use of BRT Water Rights**

[¶17] In 2009 or 2010, the Wyoming Board of Control approached Cam and asked him to correct the discrepancies between water rights as permitted and the water as it was actually being put to beneficial use on HST and BRT lands. Significant areas of land were being irrigated where there were no water rights, and other areas for which there were water rights had not had water applied to them for many years. Prestfeldt Surveying was retained to research the water rights, means of conveyance and reliability of supply, and ultimately produced a series of maps to accompany four Petitions for Change of Place of Use. Cam testified with regard to the rearrangement of the water rights: "So really every trust benefited from this. Basically you're taking unused water and putting it where it can be used."

[¶18] The petitions were signed by Cam as trustee of the BRT[4] and as trustee of the HST. Although each petition stated that the petitioners (BRT and HST) were the owners of the lands at issue, in fact the petitions covered 36 acres owned by Cam individually, and 160 acres owned by Cam, Julia, and three other family members (the "Tracy property"). Some BRT water rights were moved to the Tracy property, in exchange for which the Tracy property rights were moved to BRT property. Some Tracy water rights were also moved to Cam's property, which had no water rights prior to the changes in place of use.

[¶19] The petitions were filed in July 2011, and granted by the Wyoming Board of Control in February 2012. These water rights changes in place of use were not reported to the beneficiaries, Cam testified, because "it was not on the radar."

[¶20] No information regarding the water rights petitions was provided to Spike in discovery. Spike learned of them from another source, and shortly thereafter, his counsel listed the four Petitions for Change of Place of Use as exhibits. The BRT trustees objected promptly and repeatedly to any discussion of the petitions, arguing that the water rights issue was an unpled claim, and that the exhibits were not identified until long after the applicable deadlines.

[¶21] Although his initial complaint sought various forms of relief, by the time of trial Spike sought only the removal of the trustees. The district court found that Cam and Julia had breached their duty of loyalty and should be removed as BRT trustees. They appealed that decision. The district court made no finding as to trustees Sarah and Edith, so they continue as BRT trustees. Spike appealed that portion of the decision.

---

[4] The other trustees had given Cam permission to sign on behalf of the Trust.

## *STANDARD OF REVIEW*

[¶22]     Following a bench trial, this Court reviews a district court's findings and conclusions using a clearly erroneous standard for the factual findings and a *de novo* standard for the conclusions of law. *Piroschak v. Whelan*, 2005 WY 26, ¶ 7, 106 P.3d 887, 890 (Wyo. 2005)[.]

> The factual findings of a judge are not entitled to the limited review afforded a jury verdict. While the findings are presumptively correct, the appellate court may examine all of the properly admissible evidence in the record. Due regard is given to the opportunity of the trial judge to assess the credibility of the witnesses, and our review does not entail re-weighing disputed evidence. Findings of fact will not be set aside unless they are clearly erroneous. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.

*Piroschak*, ¶ 7, 106 P.3d at 890. Findings may not be set aside because we would have reached a different result. *Harber v. Jensen*, 2004 WY 104, ¶ 7, 97 P.3d 57, 60 (Wyo. 2004). Further,

> we assume that the evidence of the prevailing party below is true and give that party every reasonable inference that can fairly and reasonably be drawn from it. We do not substitute ourselves for the trial court as a finder of facts; instead, we defer to those findings unless they are unsupported by the record or erroneous as a matter of law.

*Id.* (quotation marks omitted) (some citations omitted).

*Pennant Serv. Co. v. True Oil Co., LLC*, 2011 WY 40, ¶ 7, 249 P.3d 698, 702–03 (Wyo. 2011).

6

*BJ Hough, LLC v. City of Cheyenne*, 2012 WY 140, ¶ 8, 287 P.3d 761, 764-65 (Wyo. 2012) (some citations omitted). Statutory interpretation presents a question of law which we review *de novo*. *Sinclair v. City of Gillette*, 2012 WY 19, ¶ 8, 270 P.3d 644, 646 (Wyo. 2012). An incorrect application of law can lead to errors in findings of ultimate fact. *See, e.g., Brown v. Arp and Hammond Hardware Co.*, 2006 WY 107, ¶ 40, 141 P.3d 673, 685-86 (Wyo. 2006); *Jackson Hole Mountain Resort Corp. v. Alpenhof Lodge Assocs.*, 2005 WY 46, ¶ 17, 109 P.3d 555, 561 (Wyo. 2005).

*Barlow Ranch, Ltd. Partnership v. Greencore Pipeline Co. LLC*, 2013 WY 34, ¶ 14, 301 P.3d 75, 82 (Wyo. 2013).

## *DISCUSSION*

[¶23] We begin by determining the standard for measuring the performance of the trustees, a question of law which we review *de novo*. *Id.* A "trustee of a business trust, like a director and officer of a corporation, owes the trust and its investors fiduciary duties of care and loyalty[.]" *Bergeron v. Ridgewood Sec. Corp.*, 610 F.Supp.2d 113, 135 (D. Mass. 2009). The interpretation of unambiguous trust agreements is a matter of law for the court. *Evans v. Moyer*, 2012 WY 111, ¶ 21, 282 P.3d 1203, 1210 (Wyo. 2012). The BRT trust agreement provides that "No trustee hereunder shall be held personally liable for any act or omission whatever which he performs, commits, or suffers in good faith." In *Kerper v. Kerper*, 780 P.2d 923, 929-30 (Wyo. 1989), we considered similar language in a trust and held that such a provision "is a limitation on liability," although it is "strictly construed." There, we reversed the district court's determination that the trustee had breached her fiduciary duty, because "it did not give effect to the settlors' intent to limit the trustee's liability for the administration of the trust," and instead "incorrectly used the reasonably prudent man standard[.]" *Id.* at 931. *See also Dallas Dome Wyo. Oil Fields Co. v. Brooder*, 97 P.2d 311, 318 (Wyo. 1939) ("[T]he liability which devolves on a trustee by reason of his accepting the trust may be limited by the terms of the trust instrument, and where the liability of the trustee is (so) limited . . . the general rules of law are not applicable. (Citation omitted.)").

[¶24] In its Findings of Fact, Conclusions of Law and Judgement [sic], the district court recognized the good-faith provision in the BRT, yet it went on to apply a higher standard to the trustees' actions in this case. For example, in reaching the conclusion that Julia breached her fiduciary duty in her handling of the Nature Conservancy transaction, the district court said: "a trustee owes a higher duty than the ordinary standard of good faith, and such conduct which may seem permissible to an ordinary person, is prohibited to a person in a fiduciary position, as he or she is held to 'something stricter than the morals

7

of the market place.'" (Citations omitted.) Spike urges us to adopt this "good faith-plus" standard, citing, among other things, to our decision in *Wells Fargo Bank Wyoming, N.A. v. Hodder*, 2006 WY 128, ¶ 33 n.7, 144 P.3d 401, 413 n.7 (Wyo. 2006), where we said:

> The common law duty of loyalty is the fundamental duty from which each more specific trustee's duty is derived. A trustee is under a duty to the beneficiary in administering the trust to exercise such care and skill as a man of ordinary prudence would exercise in dealing with his own property.

[¶25] Spike overlooks the next paragraph, where we stated "the common law duty owed by a trustee goes beyond mere 'good faith' unless otherwise provided by the express terms of the trust." *Id.* Here, the express terms of the trust provide that the BRT trustees' duty does not go beyond good faith.

[¶26] We have defined "good faith" as "faithfulness to an agreed common purpose and consistency with the justified expectations of the other party; it excludes a variety of types of conduct characterized as involving 'bad faith' because they violate community standards of decency, fairness or reasonableness." *Hodder*, 2006 WY 128, ¶ 33, 144 P.3d at 413 (quoting *Scherer Const., LLC v. Hedquist Const., Inc.*, 2001 WY 23, ¶ 18, 18 P.3d 645, 653 (Wyo. 2001)). The district court erred as a matter of law to the extent that it relied upon a duty higher than that.

[¶27] We held in *Kerper* that a good faith standard does not exclude application of fiduciary obligations imposed by Wyoming statutory provisions. *Kerper*, 780 P.2d at 930. The district court ruled that the provisions of the previous Uniform Trustees' Powers Act, Wyo. Stat. Ann. §§ 4-8-101 through 4-8-112 (repealed 2003), and the Uniform Prudent Investor Act, Wyo. Stat. Ann. §§ 4-9-101 through 4-9-113 (repealed 2003), are applicable to the BRT,[5] and we hold that application of the fiduciary standards contained in those statutes is consistent with a good-faith standard. Thus, the BRT trustees must conduct themselves in compliance with the statutory duty of loyalty, which requires that "[a] trustee shall invest and manage the trust assets solely in the interest of the beneficiaries." Wyo. Stat. Ann. § 4-9-105 (repealed 2003, replaced by Wyo. Stat. Ann. § 4-10-905, which has identical language).

[¶28] Restatement (Second) of Trusts § 170 (1959) similarly provides:

---

[5] The district court held that the Wyoming Uniform Trust Code, enacted in 2003, "does not apply to this case."

**Duty of Loyalty.**

(1) The trustee is under a duty to the beneficiary to administer the trust solely in the interest of the beneficiary.

(2) The trustee in dealing with the beneficiary on the trustee's own account is under a duty to the beneficiary to deal fairly with him and to communicate to him all material facts in connection with the transaction which the trustee knows or should know.

[¶29] Because the only remedy Spike has sought is removal of the BRT trustees, and the district court ordered removal of trustees Julia and Cam, we next turn to the standard for removal of trustees. The trustees urge us to apply the standard set forth in *In re Hartt Estate*, 295 P.2d 985, 1011 (Wyo. 1956):

> As we have seen the removal of an executor or trustee is harsh and severe; it is serious; it is a drastic action; it should not be done unless clearly necessary; if the court can adjust the disputed matters, the removal should not be made; an executor or trustee should not be removed except for gross and willful misconduct.

[¶30] Spike correctly points out that the trustees at issue in *Hartt*, unlike the BRT trustees, had been chosen by the settlor, and "[c]ourts are more reluctant to remove a trustee who has been chosen by the settlor than one who is court-appointed." Bogert, *The Law of Trusts and Trustees* § 527, at 51-52 (2d ed. 1978); *see also* Restatement (Third) of Trusts § 37, cmt. f (2003). Although the BRT trustees were not individually selected by the settlors, neither were they appointed by the court. They are not strangers to the Trust as a court-appointed trustee would be; they are all Forbes family members, selected pursuant to the terms of the Trust by existing trustees. The BRT settlors contemplated the inherent conflict that exists when trustees are also beneficiaries.

> A settlor has a great deal of discretion in designating a trustee. *Copley v. Copley*, 126 Cal.App.3d 248, 178 Cal.Rptr. 842, 847 (1981) (positions with obvious conflict of interests created and intended by trustor preserved as trustee intended). The law is settled that a trustee may be an interested party, such as a beneficiary or remainderman. *Lovett v. Peavy*, 253 Ga. 79, 316 S.E.2d 754, 757 (1984) (where antagonistic interests of trustee as remainderman known to settlor, error to remove trustee solely based on status as remainderman); *In re Luhrs Trust*, 443 N.W.2d 646 (S.D. 1989); *see also*

> *Restatement (Second) of Trusts,* § 99 cmt. a (1959). Generally, the court will not remove a testamentary trustee absent a demonstrated abuse of power. *Copley*, 178 Cal.Rptr. at 866; *Culver v. Culver*, 112 Ohio App. 100, 169 N.E.2d 486 (1960) (so long as trustee executes trust in good faith and sound discretion, court has no right to interfere).

*In re Estate of Klarner*, 113 P.3d 150, 157 (Colo. 2005).

[¶31] We conclude as a matter of law that the *In re Hartt* standard for removal of trustees is applicable to this case.

[¶32] Trustees may be removed for a variety of grounds, ranging from habitual drunkenness to tax evasion, to disobedience of directions in the trust instrument. Bogert, *supra*, § 527. "Mismanagement of the estate arising from a misconception or misunderstanding of the trustee's duties may be a ground for removal, but not if no serious harm has been done and no dishonesty or want of capacity is indicated. Similarly, a mere error in judgment is insufficient." *Id.* at 67-69.

[¶33] The district court's power to remove a trustee is "rooted in equity," *Kerper*, 780 P.2d at 938 (citing Wyo. Stat. Ann. § 2-3-210), and the court has "sound discretion" to make the determination whether to remove a trustee, which we will not disturb absent an abuse of discretion. *Id.*

[¶34] We turn then to the specific allegations of error by the district court.

I. *Was the district court's decision to remove Cam and Julia as trustees because of the exchange of water rights reversible error because it was based on an unpled claim and because it made clearly erroneous findings regarding the exchange of water rights?*

[¶35] Spike's Amended Complaint asserts claims for 1) breach of duty of loyalty, 2) breach of duty with regard to taxation, and 3) breach of duty to provide accounting. The district court based its decision to remove Cam and Julia as trustees only on its finding that they breached their duty of loyalty. Spike's Amended Complaint alleges three specific grounds for his breach of the duty of loyalty claim: the trustees' failure to file as a Wyoming statutory trust, the issuance of shares, and various land transactions.[6] There

---

[6] The land transactions are specifically identified in the Amended Complaint as follows:

> The trustees have failed to conduct themselves in an arms-length, fiduciary manner specific to the 2007 land transaction with William C. Forbes, in his individual capacity; the 2010 land transactions with the

10

is no mention of water rights transfers anywhere in the Amended Complaint. After the expert witness designation deadline, the close of discovery, and the deadline for filing final pretrial memos, Spike added water rights petitions as exhibits, to which the trustees objected, arguing the water rights are issues never before asserted, and that the exhibits should be stricken. The trustees made the same argument during the final pretrial conference. Spike's counsel responded that he had only recently discovered the water rights petitions, which should have been produced in discovery.

[¶36] Although the record does not reflect the basis for the district court's ruling at trial, it allowed the admission of the water rights petitions into evidence, over the trustees' renewed objection. During direct examination of Cam, when he was asked about water rights transfers, defense counsel stated:

> Your Honor, I'm going to go ahead and object to the questioning in regards to water. There is a motion before the court that has never been decided in regards to the addition of the water issues to this lawsuit. That motion was filed before the final pretrial conference specifically in regards to the new exhibits that plaintiff had filed in regards to various water petitions. And also that motion pertained to the new causes, quote, I guess causes of action that the plaintiffs have or are trying to snowball this case into without amending their complaint.
>
> So we did object to any continuation on that front in regards to these issues.
>
> The Court: Overruled. I think it's a legitimate subject of inquiry given the wording of the report.

There was considerable testimony on the matter, and the water rights transfers formed a basis for the court's conclusion that Cam should be removed as trustee.

[¶37] Our analysis of this issue is complicated by the fact that it involves matters of both pleading and discovery, and our review is hampered by the absence of any explanation in the record for the district court's ruling. "[W]e must affirm on appeal if there exists any legally valid ground which appears in the record supporting the judgment. However, our job becomes complicated when we are presented with a judgment which fails to articulate

---

Sarah P. Forbes Revocable Trust; and the 2011 land exchange with Julia Forbes, in her individual capacity.

11

clearly the reasoning behind it." *Agar v. Kysar*, 628 P.2d 1350, 1352 (Wyo. 1981) (internal citation omitted).

## A. The Unpled Claim

### 1. Is the claim "unpled?"

[¶38] The parties first dispute whether the claim is "unpled." Spike argues he did plead a claim for breach of the duty of loyalty, and the water rights self-dealing is included within that claim. He contends the complaint is sufficient if it provides the opposing parties with notice of the claims against them, and that pleadings must be "liberally construed to ensure substantial justice." *Krenning v. Heart Mountain Irrigation Dist.* 2009 WY 11, ¶ 30, 200 P.3d 774, 783 (Wyo. 2009). The trustees cite the same case for the proposition that "[a] plaintiff has a 'fundamental obligation' to apprise his adversaries of the nature of the claim against them." *Id.*

[¶39] W.R.C.P. 8 provides, "A pleading which sets forth a claim for relief . . . shall contain . . . (2) a short and plain statement of the claim showing that the pleader is entitled to relief . . . ." W.R.C.P. 8(a). The rule further provides, "Each averment of a pleading shall be simple, concise, and direct. No technical forms of pleading or motions are required." W.R.C.P. 8(e)(1). All pleadings are to be construed liberally so as to do substantial justice. W.R.C.P. 8(f). Whether the specificity requirement of the rule has been satisfied rests upon whether fair notice has been provided to the opposing party. *Harris v. Grizzle*, 599 P.2d 580, 583 (Wyo. 1979).

[¶40] Our precedent on this issue depends somewhat upon the type of claim that is alleged. For example, when reviewing a negligence claim, we have found that "[n]o specification of the facts upon which the conclusion of negligence is based [need be] included." *Guggenmos v. Tom Searl-Frank McCue, Inc.*, 481 P.2d 48, 51 (Wyo. 1979); W.R.C.P. Form 9; *Harris*, 599 P.2d at 583-84; *see also BB v. RSR*, 2007 WY 4, ¶¶ 12-13, 149 P.3d 727, 732-33 (Wyo. 2007) (finding that a complaint for custody modification alleging that a material change in circumstances had occurred was sufficient). In such cases, a legal conclusion need not be supported by factual allegations to comply with Rule 8. However, in other cases, such as wrongful death claims, we have held, "[T]he pleadings should set out with reasonable certainty the acts on which the liability is based and all facts essential to constitute a legal cause of action for wrongful death." *Harris*, 599 P.2d at 583. We have recognized that discovery often serves to apprise the parties of the precise claims made despite vague pleadings. *In re U.S. Currency Totaling $7,209.00*, 2012 WY 75, ¶ 24, 278 P.3d 234, 240 (Wyo. 2012); *BB*, 2007 WY 4, ¶ 13, 149 P.3d at 732-33; *Watts v. Holmes*, 386 P.2d 718, 719 (Wyo. 1963).

[¶41] We recently addressed the issue of a defective pleading in the context of piercing the corporate veil. *Ridgerunner, LLC v. Meisinger*, 2013 WY 31, 297 P.3d 110 (Wyo.

12

2013). In that case, the plaintiffs sued a corporation for breach of contract, and also named one of its officers as a defendant. All of the allegations in the complaint were directed toward the corporation (the contract was between the plaintiffs and the corporation, not the individual officers). *Id.* at ¶ 13, 297 P.3d at 114-15. The allegations against the officer stated only that the officer was acting as an agent of the corporation. *Id.* at ¶ 13, 297 P.3d at 115. In affirming the district court's dismissal of the officer from the complaint, we stated, "While piercing the corporate veil is a 'doctrine wherein liability for an underlying [cause of action] may be imposed upon a particular individual,' and not a separate cause of action, the complaint must still 'contain sufficient information to indicate a desire to proceed under the doctrine of piercing the corporate veil.'" *Id.* at ¶ 15, 297 P.3d at 116 (internal citations omitted).

[¶42] Spike cites *Lynch v. Patterson*, 701 P.2d 1126 (Wyo. 1985), to support his conclusion that his pleading of the broad claim of breach of the duty of loyalty is sufficient under W.R.C.P. 8. In *Lynch*, we stated:

> A complaint which gives fair notice to the opposing party of the claims against him satisfies the specificity standard of notice pleading under our rules of civil procedure. Allegations of particular acts or omissions of the defendant are unnecessary where the duty owed by the defendants appears to exist and to have been breached. This rule holds especially where the facts lie more properly in the knowledge of the adverse party and details of the breach are available through discovery.

*Id.* at 1134 (internal citations omitted). In *Lynch*, a minority stockholder brought a stockholder derivative action seeking to recover damages allegedly resulting from actions taken by three corporate directors in violation of their fiduciary duties. *Id.* at 1128. In his complaint the minority stockholder alleged that the defendants illegally removed assets from the corporation to the detriment of the corporation and the benefit of the defendant directors. *Id.* at 1134. The district court found that the defendants had breached their fiduciary duties when they unilaterally increased their salaries while refusing to declare a dividend. *Id.* at 1133. The directors appealed, asserting that the issue of increased salaries had not been pled by the plaintiff. *Id.* We found that, "Although the complaint does not specify excessive salaries, the allegations . . . were sufficient to give notice to the defendants that the plaintiff contested the removal of assets from the corporation, whether in the form of salary increases or otherwise." *Id.* at 1134. We went on to state:

> [The plaintiff] complained that the directors had breached their fiduciary obligations by diverting funds from the corporation to its detriment. This allegation sufficed to inform the defendants that an issue existed as to the

13

reasonableness of the executive salaries and we will not overturn the award for excessive compensation on the ground of a defective complaint.

*Id.*

[¶43] *Lynch* is distinguishable from the facts of this case. There, diversion of assets could reasonably include excessive salaries, sufficient to provide the defendants with adequate notice of that issue. In this case, Spike identified three specific ways in which he contended the trustees had breached their duties of loyalty, none of which gave fair notice that water rights were at issue. We agree with Cam and Julia that the breach of duty of loyalty arising from the water rights was a claim of which they did not have fair notice.

[¶44] Here, Spike identified land transactions that he alleged constituted a breach of the duty of loyalty, but he did not identify any water transactions as a basis for that claim. The BRT trustees took a great many actions during the period that Spike now challenges. If we found as Spike urges that the breach of duty of loyalty claim encompasses any and all of those acts, the defendants would potentially be required to prepare to litigate any of the actions they took as trustees. That interpretation stretches the concept of notice pleading too far.

## 2. Amendment of the pleadings

[¶45] Normally, our rules of civil procedure would provide an orderly avenue for conforming the pleadings to the evidence. W.R.C.P. 15(b) states:

> When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues. If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice the party in maintaining the party's action or defense upon the merits. The court may grant a continuance to enable the objecting party to meet such evidence.

14

[¶46] Here, however, Spike did not file a motion to amend the pleadings, the trustees did not consent, and the district court made no determination on that issue.

[¶47] We have recognized in other cases that a district court had *de facto* ordered the pleadings amended even if it had made no such explicit ruling. *Strahan v. Strahan*, 400 P.2d 542, 543 (Wyo. 1965); *Willard Given & Assocs. v. First Wyoming Bank-East Cheyenne*, 706 P.2d 247, 249 (Wyo. 1985); *Lore v. Town of Douglas*, 355 P.2d 367, 368-70 (Wyo. 1960). In *Strahan,* the mother filed a contempt petition against father for failing to pay child support. 400 P.2d at 543. Both parties presented evidence at the hearing concerning the changed circumstances of the parties. *Id.* The district court then advised the parties that it was going to treat the issue of modification as if it had been presented to the court for a determination, and modified the visitation schedule. *Id.* at 545. The district court did not declare that it was amending the pleadings pursuant to W.R.C.P. 15(b); however, upon review, we determined that the district court had essentially performed that function. *Id.* at 544. "The record before us reveals that the trial judge in this instance considered the issue of modification as having been tried, at least by implied consent; he treated the issue as if it had been raised in the pleadings; and ***he let the parties know he would decide the matter on that basis***." *Id.* at 545 (emphasis added). In contrast, in this case, the district court never ruled on the trustees' pretrial objections, and simply, over objection, allowed the exhibits in at trial without letting the parties know how it would decide the matter.

[¶48] The court and the parties might have solved their dilemma by resorting to the last sentence of Rule 15(b): "The court may grant a continuance to enable the objecting party to meet such evidence." Neither party moved for a continuance, and the district court did not suggest it. We found in *White v. Board of Trustees of Western Wyoming Community College District*, 648 P.2d 528, 537 (Wyo. 1982), that a party's failure to request a continuance can foreclose appeal on the issue of an unpled claim. There, we affirmed the district court when it allowed evidence at a termination hearing concerning underage drinking and marijuana use by students while under a professor's supervision. The professor claimed on appeal that he was surprised by the allegations, and expected to defend himself on an entirely different allegation pursuant to the notice that he was given. *Id*. at 537. However, the matter was raised by the school district in opening statements, and was then addressed by several witnesses. White's counsel "made a half-hearted objection to the subject matter. He referred to [the charge] as 'euphemistic,' but never complained that the charge would not include the conduct on band trips reflected by the evidence." *Id*. at 534. The professor then proceeded to put on his case. We held that he had received sufficient notice of the claims against him when he was provided the school regulations on drugs and alcohol and "was advised that names of witnesses would be furnished upon request" (which he had not requested). *Id*. at 537. We went on to find that, "Even if the appellant genuinely felt that he was surprised by the evidence and it was not reflected in the charges, failure to request a continuance on the ground of surprise

15

precludes him from now contending that he was prejudiced." *Id.* Here, however, there was no notice to the trustees that the claim would be allowed, they made numerous clear objections on the record, and, under these circumstances, we do not find their failure to request a continuance is fatal to their claim.

[¶49] We turn then to the question of whether the trustees' failure to produce the water rights information in discovery might nevertheless justify consideration of the issue.

### 3. Should the water petitions have been produced in discovery?

[¶50] Generally, this Court reviews a district court's decision concerning the admission of evidence for an abuse of discretion. *Cardenas v. State*, 2014 WY 92, ¶ 7, 330 P.3d 808, 810 (Wyo. 2014).

[¶51] Spike served an interrogatory on the trustees which asked them to "describe with particularity the details of all transactions of real property . . . ." While this does not expressly identify water rights information, "[a] water right is a 'property right of high order,' with 'none of the characteristics of personal property,' and it is real property." *King v. White*, 499 P.2d 585, 588 (Wyo. 1972) (citation omitted). "[T]he rules of discovery must be liberally construed in such a way as to favor disclosure of facts by both sides." *Paul v. Paul*, 616 P.2d 707, 717 (Wyo. 1980) (McClintock, J., dissenting). The trustees violated the rules of discovery when they failed to provide information on the water rights petitions in response to Spike's interrogatory.

[¶52] We do not know if this is the conclusion the district court reached when it allowed the introduction of the water rights petitions, or when it did not require Spike to amend his complaint. W.R.C.P. 37(c) allows the district court, "***on motion and after affording an opportunity to be heard***," (emphasis added), to impose sanctions when a party, without substantial justification, fails to comply with discovery rules. In this case, the district court could have imposed the sanction of allowing the evidence to be introduced despite its late disclosure because of the trustees' failure to fully respond to the interrogatory. However, such an action would have required a motion and hearing, which did not occur here.

[¶53] Compliance with the Rule 37 requirement would likely have yielded the additional benefit of providing this court with a decision to review. Without such a decision, we cannot provide the deference to the district court that we would normally apply. The rule that "the district court's judgment will be affirmed on appeal if sustainable on any legal ground appearing in the record," *Comm. to Restore Mayor-Council Form of Gov't v. City of Rawlins*, 692 P.2d 944, 946-47 (Wyo. 1984), cannot be stretched so far as to permit us to find that the district court allowed the water rights issue to be raised at trial as a Rule 37 sanction for discovery violations, particularly when the parties below had no notice or opportunity to address any such ruling.

16

[¶54] The water rights issue was not pled with enough specificity to comply with W.R.C.P. 8 and provide fair notice, and the pleadings should have been amended pursuant to W.R.C.P. 15. The trustees violated discovery rules when they failed to inform Spike of the water rights petitions, and "[t]rial courts have broad discretion to impose [Rule 37 sanctions], including dismissal of an action or portion thereof." *In re Guardianship of Bratton*, 2014 WY 87, ¶ 22, 330 P.3d 248, 253 (Wyo. 2014). But, with no Rule 37 hearing and no articulated decision by the district court, we cannot affirm the admission of those petitions on that ground. The district court, therefore, abused its discretion in admitting the water rights evidence.

[¶55] We will nevertheless go on to address the facts regarding the water rights because our conclusion will reveal that the evidentiary ruling error is not prejudicial to the trustees.

## B. The Water Rights Transactions

[¶56] The district court found that, as a result of the water rights petitions executed by Cam:

> 19. . . . Trustee Defendants Cam Forbes and Julia Forbes each received 70 acres of BRT water, with 1881 and 1884 priority dates. BRT did not receive any payment, or other assets, in exchange for these water rights being transferred to Defendants Cam and Julia Forbes, in their individual capacities, respectively.
>
> 20. Trustees Cam Forbes and Julia Forbes additionally received 20 acres of supplemental water supply, with an 1881 priority date, from the BRT without any consideration given.
>
> 21. Trustee Cam Forbes received an additional 36 acres of surplus water from the BRT, with a priority date of 1891, without giving the BRT any consideration in return.

All parties concede that these findings by the district court were in error. In fact, 70 acres of 1891 water rights from Big Goose Creek (the Strang Appropriation) were transferred from the Tracy[7] property to BRT lands, in exchange for 70 acres of 1881 and 1884 BRT water rights out of Park Creek, and 20 acres of 1884 supplemental supply rights out of Big Goose Creek. The approximately 36 acres of water rights that ended up on lands owned by Cam came from the Tracy property.

---

[7] The Tracy property is owned by Julia, Cam, and three other family members.

[¶57] Cam testified extensively about the reason for the water rights petitions. The Board of Control had contacted him to request that permits be corrected to reflect the actual use of water on the BRT lands. The decisions on changes in place of use had a logical basis—to put water in places where it could best be used, either under existing pivots, or in locations best suited to the means of conveyance. And Cam testified that, when he worked with Prestfeldt Surveying to achieve the best allocation of the water resource, it was for the benefit of the entire family, without consideration for "any boundary of who owned what acres on the map." This attitude is reflected in the fact that the Petitions for Change of Place of Use filed with the Board of Control on behalf of the BRT and the HST, and signed by Cam as trustee of both Trusts, include property that is owned privately by Cam as well as Cam and Julia in partnership with other family members.

[¶58] The result of treating all family property without consideration for different ownership is that, when the dust settled, Cam's private property, which had never had water rights, now has 36 acres of 1891 water rights.[8] While Cam may have acted with the best interest of the trust in mind; his error was in failing to distinguish between property held by the BRT and property held by individual Forbes family members, including himself. That failure inevitably results in a breach of the duty of loyalty, which requires that "[a] trustee shall invest and manage the trust assets solely in the interest of the beneficiaries." Wyo. Stat. Ann. § 4-9-105 (repealed 2003, replaced by Wyo. Stat. Ann. § 4-10-905, which has identical language)).

> Under principles of equity, a trustee bears an unwavering duty of complete loyalty to the beneficiary of the trust, to the exclusion of the interests of all other parties. To deter the trustee from all temptation and to prevent any possible injury to the beneficiary, the rule against a trustee dividing his loyalties must be enforced with 'uncompromising rigidity.'

*Concrete Pipe & Products of California, Inc. v. Constr. Laborers Pension Trust for Southern California*, 508 U.S. 602, 616, 113 S.Ct. 2264, 2276, 124 L.Ed.2d 539 (1993) (quoting *NLRB v. Amax Coal Co.*, 453 U.S. 322, 329-32, 101 S.Ct. 2789, 2794-95, 69 L.Ed.2d 672 (1981)).

[¶59] The duty of loyalty prohibits self-dealing by trustees, because "[i]t is not possible for any person to act fairly in the same transaction on behalf of himself and in the interest

---

[8] Because the district court misunderstood the exchange of water from BRT property to the Tracy property, it made no finding as to the relative value of those water rights, and we find insufficient evidence in the record to make any such finding on review. Seniority alone is insufficient to establish relative value of water rights. Other important factors include the priority of the water rights, the reliability of the source of supply, and the ability to deliver the water to its desired place of use.

of the trust beneficiary." Bogert, *supra*, § 543, at 227. Any transaction involving trust property and an entity in which the trustee has an interest raises conflict of interest concerns. "Self-dealing by a trustee or any fiduciary is always suspect, and it is a universal rule of equity that a trustee shall not deal with trust property to his own advantage without the knowledge or consent of the *cestui que trust*." *Hosey v. Burgess*, 890 S.W.2d 262, 265 (Ark. 1995). The trustee's duty of loyalty "prohibits both self-dealing and conflicts of interest. Thus, the trustee must neither 1) deal with trust property for the benefit of himself or third parties, nor 2) place himself in a position inconsistent with the interests of the trust." *In re Paxson Trust*, 893 A.2d 99, 121 (Pa. Super. Ct. 2006) (quoting *Estate of McCredy*, 470 A.2d. 585, 597 (Pa. Super. Ct. 1983) (internal citations omitted)).[9] This court held in 1927 that:

> "A trustee is bound to act with good faith. He is not to use the trust property in his own private business, nor is he to make any incidental profits for himself in its management, nor is he to acquire pecuniary gains from his fiduciary position. An important duty of good faith prohibits the trustee from mixing the trust property and his own property together in one amount, the depositing of trust moneys in his own personal account with his own moneys in bank, and all similar modes of combining or failing to distinguish between the two funds. This rule is designed to protect the trustee from temptation, from the hazard of loss, and of being a possible defaulter, as well as to protect the trust fund."

*In re Reed's Estate*, 259 P. 815, 817 (Wyo. 1927) (quoting *In re Hodges' Estate*, 28 A. 663, 663-64 (Vt. 1894)).

[¶60] We hold that, in entering into a transaction on behalf of himself and as a trustee, Cam breached his duty of loyalty to the BRT's beneficiaries.

[¶61] The trial court abused its discretion in allowing evidence relating to an unpled claim and exhibits that were not timely identified. We must also ask "if the error was prejudicial." *Gonzalez-Ochoa v. State*, 2014 WY 14, ¶ 11, 317 P.3d 599, 603 (Wyo. 2014). An error is prejudicial if:

> [T]he error affected [the appellant's] substantial rights[.] . . . .
> The error is [prejudicial] if there is a reasonable possibility

---

[9] Restatement (Second) of Trusts § 170, cmt. b explains: "A trustee with power to sell trust property is under a duty not to sell to himself either by private sale or at auction, whether the property has a market price or not, and whether or not the trustee makes a profit thereby."

19

that the verdict might have been more favorable to [the appellant] if the error had never occurred. To demonstrate [prejudicial] error, [the appellant] must prove prejudice under circumstances which manifest inherent unfairness and injustice, or conduct which offends the public sense of fair play.

*Singer v. Lajaunie*, 2014 WY 159, ¶ 31, 339 P.3d 277, 286 (Wyo. 2014) (quoting *Proffit v. State*, 2008 WY 103, ¶ 12, 191 P.3d 974, 977-78 (Wyo. 2008) (internal citations omitted)).

[¶62] Although we have concluded that Cam breached the duty of loyalty in the water rights transactions by the mere fact that the changes in place of use included some self-dealing on his part, that finding is only prejudicial if we also conclude that the breach is a sufficient basis for his removal as trustee. As discussed further below, we do not conclude that removal is warranted. *See infra* ¶ 97.

## II.  Was the district court's finding that Julia profited from the transactions that were undertaken to place a conservation easement on the BRT property clearly erroneous?

[¶63] Spike did not challenge the trustees' decision to place a conservation easement on 1,020 acres of the BRT property, nor does he challenge the amount of compensation obtained by the BRT for the easement. Instead, he objects to the transactions which the BRT entered into with Julia so that she could obtain enough BRT shares to convert them into 1,020 acres outright. This in turn allowed the NRCS review to proceed in a timely fashion, because only Julia's eligibility pursuant to 7 C.F.R. §1491 *et seq*. had to be reviewed, instead of the eligibility of all 19 beneficiaries.

[¶64] The district court found that, after the complicated series of land and BRT share transactions that culminated in placing the conservation easement on BRT lands, "Julia Forbes, in her individual capacity, gained an additional 22 shares in the transaction, at a total value of $376,222.00." It went on to hold that Julia's profit from the conservation easement transaction "falls within the framework of self-dealing," and that such conduct warranted her removal as a trustee.

[¶65] In arriving at its conclusion that Julia profited from the conservation easement transaction, the district court apparently overlooked the fact that, in return for the 22 additional shares in the BRT, Julia had contributed 320 acres of real property to the BRT. That property, according to the trustees' calculations, was valued at $1,120,000. The

trustees satisfied themselves at the time that the transaction was fair. They contend on appeal that in fact, Julia had lost $428,000 as a result of the transaction.[10]

[¶66] While it seems clear that the district court's conclusion that Julia profited to the tune of 22 shares or $376,222 is in error, the record does not allow us to make a determination whether she profited at all, or, as the trustees now contend, lost money, because there is no complete and timely appraisal done of the property at issue. Sarah, who is an attorney, advised her co-trustees in a 2006 email that:

> Because the IRS applies very strict scrutiny to transactions between "related parties" (especially family members), and because of the values involved, any gifting of CC [Cave Creek, where their mother's home was] or any part of it would have to have a gift tax return filed; and to satisfy the IRS would have to be appraised by an independent certified appraiser[.]

[¶67] Yet when the time came to issue new BRT shares and to add and subtract real property from the BRT, the trustees relied on a number of appraisals done on different and overlapping parcels of land at different times, a market analysis, and Cam's discussions with appraisers. We decline to attempt the exercise in extrapolation that the parties urge upon us to conclude that Julia either profited or did not profit from the transaction. We simply find there is no support in the record to conclude that Julia either intended to, or did, achieve personal gain from it.

[¶68] However, as discussed, *see supra* ¶ 59, self-dealing alone constitutes a breach of the duty of loyalty. In addition, the trustees not only failed to obtain an accurate appraisal of the specific lands at issue, they did not retain separate counsel to advise the BRT, they made no effort to obtain court approval for the transactions, and they did not obtain prior approval of these specific transactions from the beneficiaries.[11]

[¶69] Whether or not Julia profited from the transaction, she engaged in land and money exchanges with the BRT, which were compounded by the absence of objective advice or third-party review, thus breaching her duty of loyalty. However, a finding that there was

---

[10] Cam testified that "the number of shares that Julia received back was less than what she surrendered. The difference in value was she effectively paid capital gains tax out of her pocket." In addition to the 22 BRT shares, Julia had also retained the "Polo Field," which the trustees valued at $316,000. The testimony at trial was that she was retaining that property only until this lawsuit was resolved. We expect the Polo Field will be promptly conveyed to the BRT or a BRT entity.

[11] The BRT does not require beneficiary approval; however, under the circumstances, it might have been one approach to lifting the clouds over these transactions.

21

a breach of the duty of loyalty does not necessarily lead to the conclusion that the trustees should be removed, an issue which we will discuss further below. *See infra* ¶¶ 94-97.

### III.   *Did the district court err in when it found that Cam and Julia improperly issued new shares in the BRT?*

[¶70]  The district court held that the "Trust Instrument does not give the trustees broad discretion to create new shares." It went on to conclude that, "in creating additional shares and distributing such shares to" Julia, the trustees breached their duty and Julia should be removed as trustee. Julia and Cam contend on appeal that they had a good-faith basis for believing that they could issue new shares in the BRT.

[¶71]  The parties no longer dispute that the BRT is a Massachusetts Business Trust.

> The 'Massachusetts Trust' is a form of business organization, common in that State, consisting essentially of an arrangement whereby property is conveyed to trustees, in accordance with the terms of an instrument of trust, to be held and managed for the benefit of such persons as may from time to time be the holders of transferable certificates issued by the trustees showing the shares into which the beneficial interest in the property is divided. These certificates, which resemble certificates for shares of stock in a corporation and are issued and transferred in like manner, entitle the holders to share ratably in the income of the property, and, upon termination of the trust, in the proceeds.

*Navarro Savings Ass'n v. Lee*, 446 U.S. 458, 468, 100 S.Ct. 1779, 1785, 64 L.Ed.2d 425 (1980). The Massachusetts Business Trust was used as a form of business organization, "to secure corporate advantages without incorporation." Bogert, *supra*, § 247, at 182, 189.

[¶72]  We look to the language of the trust instrument to determine whether it authorizes the issuance of new shares.

> Interpretation of an unambiguous trust agreement is a matter of law for the court. *Rock Springs Land and Timber, Inc. v. Lore*, 2003 WY 100, ¶ 12, 75 P.3d 614, 619 (Wyo. 2003). The meaning of a trust is determined by the same rules that govern the interpretation of contracts. In interpreting a trust, our primary purpose is to determine the intent of the settlor. *Wells Fargo Bank Wyoming, N.A. v. Hodder*, 2006 WY 128, ¶ 21, 144 P.3d 401, 409 (Wyo. 2006);

22

*First Nat'l Bank & Trust Co. v. Brimmer*, 504 P.2d 1367, 1369 (Wyo. 1973). We construe the trust instrument as a whole, attempting to avoid a construction which renders a provision meaningless. *Id.* "We strive to reconcile by reasonable interpretation any provisions which apparently conflict before adopting a construction which would nullify any provision." *Wells Fargo,* ¶ 21, 144 P.3d at 409. *See also, Purcella v. Purcella*, 2011 WY 124, ¶ 14, 258 P.3d 730, 734-35 (Wyo. 2011).

*Evans*, 2012 WY 111, ¶ 21, 282 P.3d at 1210.

[¶73]   The Trust provides:

> EIGHTH – The trustees for the time being hereunder shall have full power to sell, lease, mortgage, pledge, lend **or *exchange*** free and clear of the trust any and all portion or portions of the trust estate at such time, for such considerations, and upon such terms and conditions as they deem advisable.  This power shall extend to everything which shall ***hereafter be added to the trust estate or received in exchange*** for the premises hereby conveyed.

(Emphasis added.)

[¶74]   This language clearly contemplates that property could be added to the trust estate, and that the trustees may make exchanges in order to acquire additional property.  Read in conjunction with the broad general grant of power to the trustees,[12] the provision authorizes the BRT trustees to acquire additional lands in exchange for shares, and it necessarily gives them the power to create new shares.  (Spike expressed the same opinion in an e-mail of March 12, 2011, in which he stated, "The trustees of the BRT have broad enough powers that there probably is no legal jeopardy . . ." and only expressed a concern about the possible tax consequences of a share-for-asset exchange.)[13] This conclusion is consistent with the purpose of a business trust, which functions like a

---

[12] Any two trustees shall have power to do any such things and execute any such instruments and take any such action as they deem wise in relation to the granted premises and the trust estate for the time being to the same effect and to the same extent as if they held the same free of any trust whatsoever.

[13] Spike's position, in addition to advice that Cam received from his counsel that the BRT had the authority to issue shares, would establish that even if the trustees were mistaken, they acted in the good-faith belief that they were authorized to issue shares in the BRT.

23

corporation, and issues certificates "which resemble certificates for shares of stock in a corporation and are issued and transferred in a like manner[.]" *Navarro Sav. Ass'n*, 446 U.S. at 468, 100 S.Ct. at 1785.

[¶75] The district court erred as a matter of law when it found that the trustees did not have the discretion to create new shares in the BRT.

***IV. Did the district court commit reversible error when it allowed undesignated expert testimony, concluded property deeded to Cam was not suitable for development in spite of Spike's expert's testimony otherwise, and based its finding on difference in value by comparing a 2007 value of one property to a 2013 value of another?***

[¶76] Cam exchanged an undivided 31 percent interest in an 80-acre tract of land (the Jeffries 80) for 36.88 acres of BRT property upon which he had built his house.[14] The district court found that:

> 13. The trial testimony established that the property was not physically inspected and driven over as large parts of the property is impossible to drive over due to its steep terrain. Testimony further established that the property deeded by Cam Forbes to BRT is not suitable for development due [to] the steep character of the land.
>
> 14. The 36.88 acres of property deeded in fee simple to Cam Forbes in 2007 was valued at $320,000.00. The property the BRT received as tenants-in-common was a 31% interest in 80 acres valued at $205,000.00 in 2013.
>
> 15. The value of the 31% interest in the 80 acres the BRT received as tenants-in-common translates to approximately 25 acres and is valued at approximately $63,550.00. The difference in value between the fee simple property Defendant Cam Forbes received in the transaction and the tenants-in-common property he provided in the exchange was approximately $256,450.00.

[¶77] The district court held that the transaction "benefited [] Cam Forbes at the expense of all other beneficiaries," that the "trustees misrepresented facts to the beneficiaries," and that the trustees "breached their duty of loyalty and their duty to act in good faith to the beneficiaries by approving the land exchange."

---

[14] The Trust authorizes beneficiaries to build homes on BRT property.

24

[¶78] Julia and Cam challenge the factual basis for these findings, asserting that the undesignated expert witness should not have been allowed to testify regarding the value of the exchanged land; that it was error to compare a 2007 appraisal of one property to a 2013 appraisal of the exchanged property; and that the conclusion the property exchanged by Cam was unsuitable for development was contrary to the testimony of Spike's own (undesignated) expert. We address each of these in turn.

## A. The Undesignated Expert

[¶79] The district court ordered Spike to designate expert witnesses by March 8, 2013. Although James Urbatchka had completed his appraisal of the Jeffries 80 in January 2013, he was not designated as an expert.[15] After Spike listed Mr. Urbatchka's 2013 appraisal as an exhibit in his final pretrial memo, the Sarah P. Forbes Revocable Trust (which was a defendant at the time but would be dismissed from the case prior to trial) filed a motion in limine to bar Mr. Urbatchka from testifying to any opinion set forth in his January 2013 appraisal.[16] The BRT trustees raised their objection to Mr. Urbatchka's testimony regarding the 2013 appraisal in their Response to Plaintiff's Pretrial Memorandum, filed May 28, 2013. The district court denied the motions in an August 13, 2013[17] ruling, stating:

> The Court finds that any testimony by Mr. Urbachka's [sic] regarding appraisals he did on behalf of Plaintiff is proper regardless of Mr. Urbachka's [sic] designation or not as an expert. The Court notes that Mr. Urbachka [sic] provided both parties with appraisals in his professional capacity, and his testimony would therefore appear to be relevant to both parties.

[¶80] The parties do not dispute that, as to the 2013 appraisal, Mr. Urbatchka was testifying as an expert who was subject to the expert designation requirements and deadlines. Mr. Urbatchka's testimony regarding his 2013 appraisal formed the basis for the district court's finding that the BRT trade for a 31 percent interest in Cam's property was not fair. Julia and Cam argue that this testimony should not have been admitted, because it violated both the district court's scheduling order and W.R.C.P. 26(a)(2). They contend that W.R.C.P. 37(c)(1) requires that "A party that without substantial justification fails to disclose information as required by Rule 26(a) or 26(e)(1) or to amend a prior response to discovery as required by Rule 26(e)(2) is not, unless the error is harmless, permitted to use as evidence at trial, at a hearing, or on a motion any witness

---

[15] Mr. Urbatchka had been listed as a "may call" fact witness by Spike, and earlier appraisals he had done (not for purpose of trial) had been identified by the trustees as exhibits.
[16] The BRT trustees filed a joinder to this motion in limine on May 28, 2013.
[17] Trial began August 19, 2013.

or information not so disclosed." Spike contends there was no surprise or prejudice to the trustees because they planned to have Urbatchka testify about other appraisals anyway.

[¶81] "A ruling on the admission or exclusion of expert witness testimony based on a violation of a pre-trial order is within the trial court's discretion, and we will not overturn the decision absent a showing of an abuse of that discretion." *Smith v. Paiz*, 2004 WY 14, ¶ 15, 84 P.3d 1272, 1277 (Wyo. 2004) (citing *Winterholler v. Zolessi*, 989 P.2d 621, 624-25 (Wyo. 1999)). We are not informed why the district court ruled as it did, and we can discern no reasonable basis for doing so.

[¶82] We have held that when a party claims an error in the admission of evidence on the basis of unfair surprise and prejudice, we will not consider the alleged error unless the party sought a continuance upon learning of the alleged surprise. *Miller v. Beyer*, 2014 WY 84, ¶ 56 329 P.3d 956, 972 (Wyo. 2014); *Parrish v. Groathouse Constr., Inc.*, 2006 WY 33, ¶ 15 n.4, 130 P.3d 502, 507 n.4 (Wyo. 2006); *Meyer v. Rodabaugh*, 982 P.2d 1242, 1245 (Wyo. 1999). However, in each of these cases, the district court had offered a continuance which the objecting party declined. In *Betts v. Crawford*, 965 P.2d 680, 685 (Wyo. 1998), the case in which we first applied the rule to expert witness designation, we found that the plaintiff's case was not harmed by the expert testimony. In *Morris v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2012 WY 71, ¶ 30, 276 P.3d 399, 407 (Wyo. 2012), we backed away from a strict requirement that the party must request a continuance in order to preserve the issue for appeal, holding that where a party clearly identifies its objection to the evidence, moves for its exclusion, and the objection is preserved in the record, we will consider the claim of error under our *Winterholler* analysis. *Id*. While it would always be prudent to request a continuance, both to allow the district court the opportunity to cure the surprise and to preserve the issue on appeal, here, as in *Morris*, the trustees made reasonable efforts to preserve the issue.[18] They filed a motion in limine immediately upon receiving notice that Spike intended to use Mr. Urbatchka's 2013 appraisal, and objected again in their Response to Plaintiff's Pretrial Memorandum. The district court did not rule on those motions until six days before trial. We hold that, under these circumstances, the failure to request a continuance is not an absolute bar to the trustees' appeal of the issue, and we will instead analyze it by applying the *Winterholler* factors.

[¶83] In *Winterholler*, we adopted the following factors for evaluating whether the district court abused its discretion in admitting or excluding a party's supplementation of its disclosures after the conclusion of expert discovery:

> (1) whether allowing the evidence would incurably surprise or prejudice the opposing party;

---

[18] Contrast *In re MC*, 2013 WY 43, ¶ 48, 299 P.3d 75, 85 (Wyo. 2013) (in which objecting party took no steps to attempt to correct or preserve the issue of claimed undesignated witnesses).

(2) whether excluding the evidence would incurably prejudice the party seeking to introduce it;

(3) whether the party seeking to introduce the testimony failed to comply with the evidentiary rules inadvertently or willfully;

(4) the impact of allowing the proposed testimony on the orderliness and efficiency of the trial; and

(5) the impact of excluding the proposed testimony on the completeness of the information before the court or jury.

*Winterholler v. Zolesssi*, 989 P.2d 621, 628 (Wyo. 1999) (quoting *Dada v. Children's Nat'l Med. Ctr.*, 715 A.2d 904, 909 (D.C. 1998); *see also Morris*, 2012 WY 71, ¶ 31, 276 P.3d at 407.

[¶84] First, allowing the evidence of Mr. Urbatchka's 2013 appraisal six days before trial provided no opportunity for the trustees to find or designate an expert to counter his testimony. There is no question that the testimony was prejudicial to the trustees, since it formed the basis for the district court's conclusion that the land exchange was unfair to the BRT beneficiaries.

[¶85] Second, excluding the evidence would not have incurably prejudiced the party seeking to introduce the 2013 appraisal. The evidence of the Jeffries 80's value in 2013 is of questionable relevance or reliability, and should not have been admitted in any case. The district court compared a 2007 appraised value of the land Cam acquired from BRT ($320,000.00) to a 2013 appraised value of the interest in land Cam traded to the BRT ($63,550.00). Julia and Cam contend that it is improper to compare property values with such a lapse of time, particularly when there was a "major stock market crash and decline in real estate values, and the extended recession" in the interim. We agree that an appraisal of the property's value as of 2013 is a poor indicator of its value in 2007, and should not have been relied upon by the district court.[19] *See Anderson v. Bauer*, 681 P.2d 1316, 1325 (Wyo. 1984) (error for the plaintiffs to use a 1983 appraisal for claim of diminished value arising from a 1978 injury).

[¶86] Third, the record does not indicate whether Spike failed to designate Mr. Urbatchka as an expert with respect to the 2013 appraisal inadvertently or willfully. We only know that the appraisal was completed in January of 2013, and the expert witness

---

[19] A retrospective appraisal, valuing the property as of 2007, would have been the appropriate measure and is an accepted method employed by professional appraisers. *Day v. Stascavage*, 251 P.3d 1225, 1230-31 (Co. App. 2010).

designation deadline was March 8, 2013. Spike has presented no explanation for the failure to designate, and this factor weighs against him.

[¶87] Fourth, allowing Mr. Urbatchka's testimony had minimal impact on the orderliness and efficiency of trial, as he was likely going to be called in any case as a fact witness.

[¶88] Finally, in this case, excluding the evidence would have resulted in a great deal more accurate information for the district court's consideration, in view of the fact the 2013 appraisal has very little relevance to the 2007 property values.

[¶89] Applying the *Winterholler* factors to these facts, we must conclude that the district court abused its discretion in admitting and relying on the expert testimony concerning the 2013 value of the Jeffries 80.

## B.    Suitability for Development

[¶90] The district court found that the Jeffries 80 property exchanged by Cam to the BRT "is not suitable for development due to the steep character of the land." It further concluded the parcel "is steep, inhospitable and most certainly not fit for any other purpose than what it is being used for now, which as far as this Court can tell, is nothing."

[¶91] The record does not support this conclusion. In fact, Mr. Urbatchka testified "I think there was enough relatively flat land that you could put four houses there, sure." The district court's findings of fact as to the Jeffries 80 suitability for development are clearly erroneous.

[¶92] Our conclusions regarding the district court's errors in evaluating the 2007 land transaction between Cam and the BRT do not, however, exonerate the trustees. The fact remains that Cam as trustee entered into a transaction with the BRT, which alone raises questions regarding his duty of loyalty. Although the trustees insist that Cam recused himself as a BRT trustee prior to the decision being made, his recusal at the last leg of the negotiation does not satisfy his duty of loyalty. "Where there are several trustees, one of them cannot properly purchase trust property for himself, although his co-trustees are not personally interested in the purchase and consent to the sale." Restatement (Second) of Trusts § 170, cmt. b.

[¶93] We conclude once again, that the BRT trustees were careless in allowing the individual trustees to enter into deals with the Trust, especially with no safeguards in place to ensure the fairness of the transactions. While we recognize that this may have been the acceptable way of doing business for the BRT trustees for many years, such conduct does not meet the duty of loyalty. As a practical matter, as soon as a single

28

beneficiary becomes adverse, as Spike apparently did after 2007, anything short of strict adherence to the duties imposed by the Trust and the law will result, at the very least, in the type of litigation we see here.

## C. Was Removal Warranted?

[¶94] The ultimate question is whether the district court correctly removed Cam and Julia as BRT trustees. We find that the district court based that decision on a number of clearly erroneous findings of fact. The water rights that were moved to Cam's property did not come from BRT lands. Julia did not gain $376,226 from the Nature Conservancy transaction. The Jeffries 80 property could have four houses built on it. The value of the Jeffries 80 in 2013 is not a reliable measure of its value in 2007. The district court also applied an incorrect legal standard to the trustees' duty, and allowed evidence and testimony without explanation or a discernible basis.

[¶95] Remand would serve no purpose under these circumstances, where the facts are sufficient for a final determination. As discussed above, we find that trustees Cam and Julia did engage in self-dealing in the 2007 Cam land exchange, the conservation easement transactions, and the water rights changes in place of use. Removal of a trustee, however, "usually will not be grounded on a mere error of judgment or conduct even though there is a technical breach of the trust, if the trust estate does not suffer." *Schildberg v. Schildberg*, 461 N.W.2d 186, 191 (Iowa 1990) (citing 76 Am. Jur. 2d *Trusts* § 130, at 370 (1975)). "Generally, the court will not remove a testamentary trustee absent a demonstrated abuse of power." *In re Estate of Klarner*, 113 P.3d at 157 (citing *Copley v. Copley*, 178 Cal.Rptr. 842, 866 (1981); *Culver v. Culver*, 169 N.E.2d 486, 489 (1960) (so long as trustee executes trust in good faith and sound discretion, court has no right to interfere)). Although Cam and Julia engaged in self-dealing, there is no evidence the trust estate suffered, nor is there a demonstrated abuse of power.

[¶96] Spike suggests that hostility alone is a basis for removal of the trustees. But, while it is apparent that Spike feels hostile toward the trustees (for example, referring to their actions as "[a]bsolute idiocy," "where selfish pursuit of getting the personal max they can out of every situation is the modus operandum" in an e-mail to Edith), there is no evidence that hostility is reciprocated.

> Hostility may naturally exist in trust relationships since trusts are usually created to withhold control of the trust principal from the beneficiaries. Hostility between the trustee and the beneficiaries of the trust alone is insufficient to require the removal of the trustee. To be sufficient to require removal, the hostility must interfere with the proper administration of the trust.

29

*In re Trust Created by Hill for Benefit of Schroll*, 499 N.W.2d 475, 485 (Minn. Ct. App. 1993) (citations omitted). We held in *Kerper*, that:

> Generally, social or familial hostility, between the trustee and one or more beneficiaries of a trust is insufficient in and of itself to warrant removal of a trustee. The real question in these situations is whether or not the hostility, in combination with existing circumstances, materially interferes with the administration of the trust or is likely to cause that result.

*Kerper*, 780 P.2d at 938. *See also Schildberg*, 461 N.W.2d at 192 ("[H]ostility . . . which results from the acts or conduct of the beneficiary, has been held not to be sufficient ground for removal."); *Symmons v. O'Keeffe*, 644 N.E.2d 631, 637 (Mass. 1995) (if mere fact of friction between the trustee and beneficiaries were basis for removal, "an obstreperous malintentioned beneficiary could cause the removal of a competent trustee through no fault on the latter's part").

[¶97] We do not find there exists hostility between the trustees and Spike such that it interferes with the proper administration of the BRT, and we conclude that Cam and Julia's self-dealing caused no serious harm, and did not establish dishonesty or want of capacity.

[¶98] It is unnecessary to address the trustees' remaining issue regarding the district court's failure to address their affirmative defenses. We also do not address Spike's issue on his cross appeal, because his argument for removal of Sarah and Edith is based on a finding that Cam and Julia should be removed, which we now reverse.

## CONCLUSION

[¶99] Cam Forbes and Julia Forbes did breach their duty of loyalty to the extent that they engaged in self-dealing with the Beckton Ranch Trust. However, the district court's finding that they benefitted from those transactions is, for the most part, clearly erroneous. Because the evidence does not demonstrate that they acted dishonestly or with want of capacity, nor that any serious harm has been done, we conclude that the breaches do not warrant their removal as trustees. We therefore reverse the district court's order removing William "Cam" Forbes and Julia Forbes as trustees of the Beckton Ranch Trust. We affirm the district court's decision not to remove Sarah Forbes and Edith Forbes.