# IN THE SUPREME COURT, STATE OF WYOMING

## 2015 WY 101

APRIL TERM, A.D. 2015

*August 5, 2015*

JAMES F. GOULD IV, individually, and
ERIN GOULD, individually, and J.G., a
minor, by and through JAMES F. GOULD
IV, her father and next friend, and J.G., a
minor, by and through JAMES F. GOULD
IV, his father and next friend,

Appellants
(Plaintiffs),

v.                                                                      S-14-0228

DANIEL OCHSNER, individually, and
FLYING RIVER RANCH LLC, and YU
LAND AND CATTLE, LLC,

Appellees
(Defendants).

*Appeal from the District Court of Park County*
*The Honorable Steven R. Cranfill, Judge*

*Representing Appellants:*
　　　S. Joseph Darrah of Darrah Law Office, P.C., Powell, WY.

*Representing Appellees:*
　　　Michael A. Labazzo, Law Offices of Michael A. LaBazzo, LLC, Cody, WY.

*Before BURKE, C.J., and HILL, \*KITE, DAVIS, and FOX, JJ.*

\*Justice Kite retired effective August 3, 2015.

NOTICE:  This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.

**HILL,** Justice.

[¶1]    James Gould, IV, his wife, and their two children, brought an action against Daniel Ochsner and his related ranch entities, asserting claims for breach of contract, unjust enrichment, conversion and fraud.  Plaintiffs' claims stemmed from promises Defendant Daniel Ochsner allegedly made during Plaintiffs' several-year tenure living and working on Defendants' Flying River Ranch.  Following a bench trial, the district court denied all of Plaintiffs' claims and Defendants' counterclaims.  Plaintiffs appeal, contending that the district court erred in denying their claims to a number of cattle and a cattle brand and in denying their W.R.C.P. 15(b) motion to amend their complaint to conform to the evidence and to add promissory estoppel claims.  Plaintiffs also challenge the district court's denial of their motion to confirm an alleged settlement agreement between the parties.   We affirm in part and reverse in part.

## ISSUES

[¶2]    There are four issues on appeal.

1.  Whether the district court erred when ruling against the Goulds on their claims related to the disputed cattle ownership.

2.  Whether the district court erred when ruling against the Goulds on their claims related to the disputed cattle brand.

3.  Whether the district court erred in denying the Goulds' W.R.C.P. 15(b) motion to amend their complaint to conform to the evidence and add promissory estoppel claims.

4.  Whether the district court erred in finding the parties did not have an enforceable settlement agreement.

## FACTS[1]

[¶3]    James Frank Gould, IV (Mr. Gould) grew up on the Gould Ranch, located west of Meeteetse, Wyoming.  The Gould family owned and operated the Gould Ranch for five

---

[1] Our standard of review following a bench trial requires that we accept a prevailing party's evidence as true.  *Redland v. Redland*, 2012 WY 148, ¶ 163, 288 P.3d 1173, 1209-10 (Wyo. 2012).  Thus, to the extent our factual overview relates to claims on which Defendants prevailed, we draw disputed facts from Defendants' evidence.  Where consideration of conflicting evidence enters our analysis, we will set forth that evidence in our discussion of the district court's ruling.

generations, since 1870, and Mr. Gould continued to live on the ranch as an adult along with his wife, Erin Gould, and their two children, James Frank Gould, V (Frank) and Jasmine Gould.

[¶4]    In 2001, Daniel Ochsner entered into a lease agreement to lease the Gould Ranch. At that time, Mr. Ochsner owned and operated a limited liability company, YU Land and Cattle, LLC, which operated three other ranches. In 2002, Mr. Ochsner purchased the Gould Ranch and renamed it the Flying River Ranch (Ranch). Mr. Ochsner retained Mr. Gould as ranch manager pursuant to an oral agreement by which Mr. Gould would receive, among other compensation, a monthly salary of $2,000.00, free housing for him and his family, and a $1,000,000.00 bonus if Mr. Gould profitably managed the ranching operation for seven years.

[¶5]    In February 2004, Mr. Gould was in a work-related vehicle accident and sustained severe injuries, including "a traumatic brain injury with residual cognitive difficulties, headaches and sleep apnea," as well as injuries to his cervical and lumbar spine, and right ankle, knee, wrist and shoulder. Mr. Gould received workers' compensation medical and disability benefits as a result of these injuries, and he underwent multiple surgeries and remained on full temporary total disability (TTD) benefits until March 2005. In March 2005, Mr. Gould entered into an approved light duty work agreement with the Ranch, whereby eighty percent of Mr. Gould's salary was covered by TTD benefits and the remaining twenty percent was paid by the Ranch. This arrangement continued until February 26, 2007, at which point Mr. Gould had received the maximum 36-month allowance of TTD benefits.

[¶6]    After Mr. Gould's accident in 2004, Mr. Ochsner had informed Mr. Gould that he wished to sell the Ranch, and in a subsequent conversation in 2007, Mr. Ochsner informed Mr. Gould that he was going to sell his cattle and get out of the cattle business because he had enough on his plate without the ranching operation. In early 2008, Mr. Gould proposed to Mr. Ochsner that he lease the Ranch to Albert and Rainy Renner, who Mr. Gould knew were looking for grass on which to graze their cattle.[2] Mr. Ochsner agreed to the lease arrangement, which he described as follows:

> A.    * * * And then [Mr. Gould] came to me and said, Dan, Albert and Rainy and I would like to lease the ranch.
> I said, Jim, what are you thinking?
> He said, Albert and Rainy, they can do all the work or most of the work, and it will allow me to also go to Bairoil and work my little oil field down there.

---

[2] Also in early 2008, on January 16, 2008, Mr. Gould began receiving permanent total disability (PTD) benefits at a monthly rate of $2,134.99.

And I said, okay, I'll think about it.

And I thought about it for a while.

Then I said, okay, I will enter into that lease. And I said, if you keep the property in pristine condition because I'm trying to sell this property, I would have a much better chance of selling the property if it was in pristine condition.

What I did was I gave them a lease for $12,000, and that was an incredible lease.

Q. Let me stop you there. Who's the "they" in that?

A. Oh, okay, okay. Jim, Albert and Rainy.

* * *

A. * * * And then what I did was I liquidated the cows that I had, some of them to another party, and then I – Jim said, you know, that he needed to make money, so I decided to give Jim Gould 60 head of cows. I offered him the rest of my cows, 39 head.

And I said, Jim, what would be a good price?

He said, $350 a head.

And I – all I wanted to do was get out of the cattle business. So Jim said he wasn't interested in those cows, those 39 head, but Albert and Rainy might be interested.

So I said, okay, I will sell Albert and Rainy those 39 cows, which they did purchase.

[¶7]     The Renner/Gould lease of the Ranch ended on November 1, 2008, after a dispute arose concerning the equipment to be used in working the Ranch property. As that lease was ending, the Goulds signed a bill of sale, dated October 8, 2008, which returned fifty-seven head of cattle to the Ranch.

[¶8]     After the Renner/Gould lease ended, Mr. Ochsner focused on selling the ranch. At that time, Mr. Gould approached Mr. Ochsner with the idea of partnering with a potential investor by the name Tom Eldrich. Mr. Ochsner reached an agreement with Mr. Gould and Mr. Eldrich whereby the Ranch would purchase a couple hundred head of cattle, and Mr. Eldrich would make a $200,000.00 contribution that would allow him to receive half of the proceeds from the future sale of any yearlings. Mr. Ochsner described the arrangement:

Q. What was Mr. Gould's agreement involving you and Mr. Eldrich?

A. Jim was going to work for Mr. Eldrich, and the responsibilities for Mr. Eldrich was to pay all the expenses,

pay Jim's salary, and my contribution to provide all – provide the ranch.

> Q. And who was going to own the cattle?
> A. Flying River Ranch was going to own all the cattle.

[¶9] The arrangement with Tom Eldrich ended by the end of 2009, after Mr. Gould expressed concerns to Mr. Ochsner that Mr. Eldrich was not paying him regularly or fulfilling his other obligations. Mr. Ochsner ended the arrangement by returning Mr. Eldrich's $200,000.00 contribution. He described what followed next in his working relationship with Mr. Gould:

> Q. Did Mr. Gould – after this relationship ended, did he come to you and say, now what?
> A. Well, I ended up with all these cattle. I was trying to figure out what I was going to do. It was in the winter. We just kind of treaded water.
> Anyway, in 2010, I told Jim – we talked about taking care of the cattle. I said I would pay him $2,000 a month if he took care of the cattle. He said that he –that would give him time to go to Bairoil and work down there and he could come back and forth and hire some help, and the ranch could continue on.
>
> * * *
>
> Q. Okay. In 2010, when you entered into the agreement for $2,000 a month, did it also include any other benefits for Mr. Gould?
> A. Well, he could still remain in the house, and he would get fuel and I would pay his utilities.

[¶10] On July 5, 2011, Mr. Gould and Mr. Ochsner entered into a written agreement to govern their continuing work relationship. The impetus for the written agreement is not entirely clear from the record, but apparently Mr. Gould had been advised by an attorney that any such agreement should be in writing. Because the July 5, 2011 agreement was not made part of the record, the terms of that agreement are not clear, but it is the final oral or written agreement that the parties entered into.[3]

---

[3] Defendants refer repeatedly in their appellate brief to the July 5, 2011 written agreement, which was admitted at trial as Exhibit V. Despite the numerous references to Exhibit V, and other defense exhibits, Defendants did not file a designation of record to have any of these exhibits included in the record on appeal, as provided by W.R.A.P. 3.05(c). The failure to so designate parts of the record makes the task of this Court's review much more difficult. We will rely on Exhibit V and the other referenced but undesignated exhibits only to the extent that we are able to glean their contents from testimony or other evidence properly designated as part of the record on appeal.

4

[¶11] In early 2012, the parties' relationship fell apart, again for reasons that are not clear from the record. On January 31, 2012, Mr. Gould resigned from his employment with the Ranch, and on February 2, 2012, the Goulds filed their complaint in district court against Defendants alleging several claims, including breach of contract, conversion, unjust enrichment, and fraud. Defendants answered and asserted counterclaims for the value of items that Defendants alleged the Goulds wrongfully removed from the Ranch.

[¶12] Shortly after the filing of the Complaint, the parties engaged in settlement negotiations, and on February 3, 2012, counsel for the Goulds e-mailed a signed settlement agreement to counsel for Mr. Ochsner. On February 4, 2012, Mr. Ochsner's attorney responded via e-mail requesting clarification of terms, as well as outlining terms she felt needed to be included in the written agreement. Counsel for the Goulds responded on that same date expressing his clients' disagreement with those terms.

[¶13] On February 9, 2012, the Goulds filed a motion to confirm the settlement agreement, and on March 2, 2012, the district court held a hearing on that motion. On April 5, 2012, the district court entered an order denying the motion, finding that there was no written instrument reflecting final and definite settlement terms and no meeting of the minds.

[¶14] On March 11–14, 2014, a bench trial was held. At the close of their case-in-chief, Plaintiffs moved, pursuant to W.R.C.P. 15(b), to amend their complaint to conform to the evidence and add promissory estoppel claims. Defendants objected, and the district court denied the motion.

[¶15] On May 21, 2014, the district court issued its decision letter denying all of Plaintiffs' claims and Defendants' counterclaims, and on June 17, 2014, the district court issued its Judgment and Order, ordering that "Plaintiffs take nothing pursuant to their Complaint" and "Defendants take nothing pursuant to their Counterclaim." On July 15, 2014, the Goulds timely filed their notice of appeal to this Court.

## STANDARD OF REVIEW

[¶16] Following a bench trial, this Court reviews a district court's findings and conclusions using a clearly erroneous standard for factual findings and a *de novo* standard for conclusions of law. *Forbes v. Forbes*, 2015 WY 13, ¶ 22, 341 P.3d 1041, 1050–51 (Wyo. 2015) (citing *Piroschak v. Whelan,* 2005 WY 26, ¶ 7, 106 P.3d 887, 890 (Wyo. 2005)).

> The factual findings of a judge are not entitled to the limited review afforded a jury verdict. While the findings are presumptively correct, the appellate court may examine all of

the properly admissible evidence in the record. Due regard is given to the opportunity of the trial judge to assess the credibility of the witnesses, and our review does not entail re-weighing disputed evidence. Findings of fact will not be set aside unless they are clearly erroneous. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.

*Forbes*, ¶ 22, 341 P.3d at 1050-51. Findings may not be set aside because we would have reached a different result. *Harber v. Jensen*, 2004 WY 104, ¶ 7, 97 P.3d 57, 60 (Wyo. 2004). Further,

> we assume that the evidence of the prevailing party below is true and give that party every reasonable inference that can fairly and reasonably be drawn from it. We do not substitute ourselves for the trial court as a finder of facts; instead, we defer to those findings unless they are unsupported by the record or erroneous as a matter of law.

*Harber*, ¶ 7, 97 P.3d at 60 (quotation marks omitted) (some citations omitted). Lastly, because this appeal involves review of a bench trial and neither party requested findings of fact and conclusions of law, this Court must consider the judgment and order to carry every finding of fact supported by the evidence. *Y-O Invs., Inc. v. Emken*, 2006 WY 112, ¶ 7, 142 P.3d 1127, 1130 (Wyo. 2006) (citing *Root v. Root*, 2003 WY 36, ¶ 11, 65 P.3d 41, 45 (Wyo. 2003)).

## DISCUSSION

### A.     The Disputed Cattle Ownership

[¶17] Plaintiffs' complaint included claims for breach of contract, unjust enrichment, conversion, and fraud relating to cattle that Plaintiffs claimed belonged to them and were wrongfully retained by Defendants when Plaintiffs left the Ranch. Specifically, Plaintiffs alleged that Mr. Ochsner gifted sixty head of cattle to Erin, Frank, and Jasmine Gould, along with any offspring of those cattle, and then asked that the Goulds temporarily sign the cattle back over to him so he could comply with requirements for a federal grazing permit. Plaintiffs allege that Defendants did not return the cattle and Plaintiffs are therefore entitled to damages for Defendants' wrongful taking of the cattle.

[¶18] The district court rejected Plaintiffs' claims relating to the cattle, concluding:

> The Court heard conflicting testimony regarding the sixty head of cattle given to Erin, Frank and [Jasmine] Gould. The Plaintiffs argue Mr. Ochsner told the Goulds they needed to sign and back-date the bill of sale of the cattle so that Mr. Ochsner would not lose the Forest Service Grazing Permit. The Defendant argues Mr. Gould gave him the cattle back after a lease with the Renner family had ended on bad terms. He also argues Mr. Gould never asked for the cows back.
>
> The Court finds the Plaintiffs did not present sufficient evidence that the sixty cattle belonged to them. The testimony from each side was in stark opposition to the other, and the Court finds the Plaintiffs did not prove by a preponderance of the evidence that the Plaintiffs were the owners of the cattle. The Court will decline to grant the Plaintiffs an award of money for the value of these cattle.

[¶19]  As the district court observed, the testimony concerning what happened with the disputed cattle was indeed conflicting. With respect to the original gifting of the cattle to the Goulds, Mr. Ochsner testified that he offered the sixty head of cattle to Mr. Gould in 2008 when they were negotiating the Gould/Renner lease because Mr. Ochsner was getting out of the cattle business and he knew that Mr. Gould needed money. Mr. Ochsner further testified that Mr. Gould said he did not want the cattle in his name and asked that Mr. Ochsner put the cattle in the names of his wife and children, with forty head going to his wife and ten head to each child. In contrast, Erin Gould testified that Mr. Ochsner gave the Goulds the cattle as part of an incentive package to keep the Goulds on the Ranch after they informed Mr. Ochsner in early 2008 that they had made a decision to move to Saratoga, Wyoming.

[¶20]  With respect to the return of the cattle to Mr. Ochsner, Mr. Ochsner testified that after the Gould/Renner lease failed, Mr. Gould brought him a bill of sale dated October 8, 2008, returning ownership of fifty-seven head of cattle to the Flying River Ranch and signed by Mr. Gould and Erin, Frank, and Jasmine Gould. Mr. Ochsner testified that Mr. Gould told him he was returning the cattle because he felt bad about the failure of the Gould/Renner lease. In contrast, Erin Gould testified that the October 2008 bill of sale was actually given to Mr. Ochsner in the summer of 2009 and back-dated to 2008 at Mr. Ochsner's request because Mr. Ochsner was in danger of losing a federal grazing permit if he did prove ownership of the cattle bearing the Goulds' JF brand. Erin Gould testified that Mr. Ochsner assured her that despite the bill of sale, the cattle still belonged to the Goulds. Jasmine Gould testified that this was also her understanding of what happened with the cattle and that Mr. Ochsner promised to return the cattle.

[¶21]  Forest Service letters to Mr. Ochsner during the summer of 2009 indicate that the Forest Service was indeed making inquiries concerning the ownership of the cattle Mr.

Ochsner intended to graze on the Wood River/Kirwin C&H Allottment. While the existence of these letters is consistent with the version of events testified to by Erin and Jasmine Gould, their existence is not sufficiently definitive so as to compel this Court to reject the district court's conclusion. Additionally, Mr. Ochsner testified:

> Q. And was there ever a time between October 2008, and when you sold the cattle in 2012, when you promised to give them back to the Goulds?
> A. Never.
> Q. Was there ever a time after you received the bill of sale in 2008, that the Goulds came to you and said, can we have our cows back?
> A. Never.
> Q. Was there ever a time, after October 2008, that Jasmine came and said, can I at least have mine back?
> A. No.
> Q. Did she ever ask what happened to her cows?
> A. No.
> Q. Did Erin Gould ever come to you, after October 2008, and say, can I have my cows back?
> A. No.
> Q. Did Erin Gould at any time after October 8, 2008, ever come to you and say, what happened to the 40 cows that she used to have?
> A. No.
> Q. Did Frank Gould ever come to you after October 8, 2008, and say, can I have my cows back?
> A. No.
> Q. Did Mr. Frank Gould ever come to you after October 8, 2008, and say, what happened to his ten cows or any calves born of that?
> A. No.
> Q. Did Jasmine or Erin ever come to you after October 2008, and say, where are the calves that were born to these 60 cows?
> A. No.
> Q. Did they ever ask for any of the proceeds of any of the calves ever sold between 2008 and prior to the final sale?
> A. No.
> Q. So, in 2009, when the calves were born, in the following year when they were yearlings and sold, did any

8

Gould ever come to you and say, can we have any of the proceeds of the sale of those yearlings?

A. No.

Q. Did they ever ask you for any money for any of either the original cows, any calves ever calved from those or any calves calved from the calves of the calves?

A. No.

[¶22] Our standard of review requires deference to the trial court's opportunity to assess witness credibility and weigh conflicting evidence and requires that we accept the prevailing party's evidence as true, giving that party every reasonable inference that can fairly and reasonably be drawn from that evidence. *Redland*, ¶ 163, 288 P.3d at 1210. Given the district court's opportunity to assess witness testimony and weigh the conflicting evidence in light of the entirety of the testimony and other evidence, we can find no clear error in the court's conclusion that Plaintiffs failed to prove their claims related to the disputed cattle.[4]

[¶23] Nor do we find merit in Plaintiffs' argument that the district court's ruling must be reversed because Plaintiffs hold legal title to the disputed cattle. This argument relates to the "A Forms" that the Goulds submitted to the Wyoming Livestock Board in May 2008 as legal proof of transfer of and legal title for the cattle. Essentially, Plaintiffs contend that because there was no brand inspection or A Form issued when they returned the cattle to Mr. Ochsner, and because they still possess the A Forms, they have legal title to the cattle. In support of their argument, Plaintiffs cite to Wyo. Stat. Ann. § 11-20-203(a) and Wyoming Livestock Board Rules and Regulations, Chapter 9, Section 3(a)(ii).

[¶24] Wyo. Stat. Ann. § 11-20-203(a) (LexisNexis 2015) provides:

(a) Except as otherwise provided in this section or except as provided in W.S. 11-20-211, 11-20-224 and 11-20-230, it is unlawful for any person, firm, partnership, corporation, or association to sell, change ownership or to remove or cause to be removed in any way from any county in Wyoming to any other state or country, any livestock unless each animal has been inspected for brands and ownership at the time of delivery or removal by an authorized Wyoming brand inspector and a proper certificate of inspection or clearance has been issued.

---

[4] Plaintiffs contend that the decision letter is deficient in that it fails to address the offspring of the disputed cattle. We do not agree. While the decision letter does not specifically mention the offspring, the district court's order states, "Plaintiffs take nothing pursuant to their Complaint, and all causes of action therein[.]" Plaintiffs' complaint made claims related to the offspring, and the court's order therefore generally denied those claims.

[¶25] Wyoming Livestock Board Rules and Regulations, Chapter 9, Section 3(a)(ii) (2013) states,

> A Form – A document created by the Board and used for intrastate and/or interstate movement of livestock; also issued when a change of ownership occurs. The blue copy of this form is considered title to the livestock as described on the form.

[¶26] We disagree that the Goulds' retention of the A Forms for the disputed cattle definitively vested ownership of the cattle in the Goulds. Plaintiffs cite no authority for the proposition that failure to have a brand inspection performed upon a sale or change of ownership voids the sale, or any authority that an A Form is the only or superior proof of title to cattle. The cited provisions do not mandate such a conclusion, and the Wyoming Livestock Board is in fact statutorily authorized to consider other documentation as proof of ownership. Specifically, Wyo. Stat. Ann. § 11-20-205(c) (LexisNexis 2015) states, "[t]he inspector may require from the person in charge proof of ownership of the livestock to be removed from the county, by brand record, bill of sale or the affidavits of at least two (2) responsible citizens of the county who are not interested financially in the animals."

[¶27] Additionally, the record supports the conclusion that Defendants in fact held title to the disputed cattle. Mr. Ochsner testified that when he initiated the sale of his cattle in 2012, he provided Barry Zeller, the brand inspector, the 2008 bill of sale and the JF brand bill of sale as documentation of his ownership of the cattle. Mr. Zeller, in turn, testified that his "superiors" reviewed the 2008 bill of sale and determined "they would hold that up as a legal change of ownership." There is thus nothing in the record or the controlling law to support Plaintiffs' contention that they retained legal title to the disputed cattle.

[¶28] In sum, after reviewing the record and applicable law, we conclude that the district court's findings and conclusions regarding the disputed cattle ownership are neither clearly erroneous nor contrary to law.

## B.   The JF Cattle Brand

[¶29] By a bill of sale dated June 5, 2009, the Goulds transferred their JF cattle brand to the Flying River Ranch. In their complaint, Plaintiffs allege that they transferred the JF brand to the Ranch for the sole purpose of allowing Defendants to run cattle bearing the JF brand on Defendants' federal grazing allotments without jeopardizing those federal permits. Plaintiffs further alleged that Defendants paid no consideration for the transfer of the JF brand, that the transfer of the brand was not intended to be permanent, and that Mr. Gould had the right to immediate possession and return of the JF brand. Plaintiffs

asserted claims for conversion and fraud related to Defendants' refusal to return the brand, and they sought damages and disgorgement as their prayer for relief.

[¶30]  The district court made no particular findings regarding the brand dispute, but the court did deny the claims with its general ruling that "Plaintiffs take nothing pursuant to their Complaint, and all causes of action therein[.]"  Because Plaintiffs' evidence concerning the temporary transfer of the JF brand was both corroborated and uncontested, we conclude that the district court erred in denying Plaintiffs' claims regarding the JF brand.[5]

[¶31]  "Conversion occurs when a person treats the property of another as his own and, in so doing, denies the true owner the enjoyment of his rights as owner." *Frost v. Eggeman*, 638 P.2d 141, 144 (Wyo. 1981) (citing *Western Nat'l Bank v. Harrison*, 577 P.2d 635 (Wyo. 1978)).

> In order for a plaintiff to recover damages for conversion, he must establish that (1) he had legal title to the converted property; (2) he either had possession of the property or the right to possess it at the time of the conversion; (3) the defendant exercised dominion over the property in a manner which denied the plaintiff his rights to use and enjoy the property; (4) in those cases where the defendant lawfully, or at least without fault, obtained possession of the property, the plaintiff made some demand for the property's return which the defendant refused; and (5) the plaintiff has suffered damage by the loss of the property. The damages awarded are determined by the value of the property converted. If disputed, the plaintiff bears the burden of proof. *Satterfield v. Sunny Day Resources, Inc.*, Wyo., 581 P.2d 1386, *cert. denied* 441 U.S. 938, 99 S.Ct. 2153, 60 L.Ed.2d 1040 (1978).

*Frost*, 638 P. 2d at 144; *see also McTiernan v. Jellis*, 2013 WY 151, ¶ 23, 316 P.3d 1153, 1161 (Wyo. 2013); *Johnson v. Reiger*, 2004 WY 83, ¶ 27, 93 P.3d 992, 999-1000 (Wyo. 2004); *Cross v. Berg Lumber Co.*, 7 P.3d 922, 929-30 (Wyo. 2000).

---

[5] Plaintiffs filed a post-trial motion under W.R.C.P. 59 and W.R.C.P. 60 requesting that the district court make specific findings regarding their conversion and fraud claim.  The record does not contain the motion, but the district court apparently did not rule on the motion.  Accordingly, we deem the motion denied pursuant to W.R.C.P. 6(c)(2) ("Any motion, under Rules 50(b) and (c)(2), 52(b), 59 and 60(b), not determined within 90 days after filing shall be deemed denied[.]").  We therefore use our general standard of review and review the district court's findings and conclusions using a clearly erroneous standard for its factual findings and a *de novo* standard for its conclusions of law.  *See Forbes*, ¶ 22, 341 P.3d at 1050–51.

[¶32] The Goulds, specifically Mr. Gould and his wife, Erin Gould, transferred the JF brand to the Flying River Ranch by a bill of sale dated June 5, 2009. Erin Gould testified that the brand transfer was intended to be temporary and was done only so that Mr. Ochsner could run cattle carrying the JF brand on his federal grazing allotments. Erin Gould's testimony is consistent with the Forest Service letters we referenced in the previous section, wherein the Forest Service requested verification that Mr. Ochsner owned the cattle carrying the JF brand. Erin Gould's testimony was further corroborated by the testimony of her daughter, Jasmine Gould, and Tim Sloan, a ranch hand who worked on the Ranch during 2009 and 2010. Jasmine Gould testified that she heard Mr. Ochsner request transfer of the brand for purposes of his Forest Service permit and heard him state that the brand would be returned to the Goulds. Tim Sloan testified:

> Q. All right. So sometime while you were working there, the brand and the cattle got transferred to Mr. Ochsner so that he could get more permits; is that your testimony?
> A. Right. He was going to acquire the brand to acquire the permits and then give the -- sign the brand back over to Jim.
> Q. How did you learn that?
> A. Because I heard him talking about it.

[¶33] Defendants presented no testimony or other evidence to refute the testimony of these three witnesses. In particular, Mr. Ochsner provided no testimony on the question of whether there was an agreement that the brand transfer would be temporary.[6] In fact, Mr. Ochsner's only testimony concerning the brand transfer is consistent with Plaintiffs' evidence that the transfer was intended to be temporary for purposes of addressing the federal permit concerns:

> Q. Dan, didn't you take the cows back, didn't you take that brand so you would be able to put those cows on the Forest Service lease?
> What was your response?
> A. That's another reason, yes. I was taking back all the cattle. I mean, all the cattle I had on the ranch would be able to go on the Forest Service.
> Q. Because you couldn't put someone else's cows on the Forest Service legally; right? . . .
> A. That's legal, yes. That's correct.

---

[6] At page 16 of their brief on appeal, Defendants assert that Mr. Ochsner testified there was no agreement or promise that the brand transfer would be only temporary. Defendants provide no record cite for this assertion, and in our review of the record, we found no such testimony.

[¶34]   The first element of conversion requires that Plaintiffs prove that the Goulds had title to the converted property.   There is no dispute that the Goulds held title to the JF brand when they executed the bill of sale to the Flying River Ranch.   Additionally, although the bill of sale purported to transfer that title to the Flying River Ranch, the unrefuted evidence establishes that the parties agreed that the transfer was merely temporary and that permanent title was to remain with the Goulds.   In effect, the parties created a constructive bailment:

> A constructive or involuntary bailment arises where the person having possession of a chattel holds it under such circumstances that the law imposes on him the obligation of delivering it to another, where a person has lawfully acquired possession of personal property of another otherwise than by a mutual contract of bailment, or where a person has lawfully acquired the possession of personal property of another and holds it under circumstances whereby he should, on principles of justice, keep it safely and restore it or deliver it to the owner.

*Hoblyn v. Johnson*, 2002 WY 152, ¶ 31, 55 P.3d 1219, 1229 (Wyo. 2002) (quoting 8 C.J.S. *Bailments* § 15 at 237 (1988)); *see also* 8 C.J.S. *Bailments* § 14 (2015).

[¶35]   We have held that in such circumstances, the bailee has "an absolute duty to return the property."   *Hoblyn*, ¶ 32, 55 P.3d at 1229 (citing Moore v. Moore, 835 P.2d 1148, 1153 (Wyo. 1992)).

> "Where the person in possession has committed no independent act of conversion, a rightful possession in him continues as such until it is transformed into a wrongful detention by a demand for the property and a refusal to deliver it." [65 C.J. 43–45.]
> .... And it is generally held that ordinarily a demand should be made by a bailor upon the bailee for the return of his goods before an action for conversion against the bailee will lie.

*Hoblyn*, ¶ 32, 55 P.3d at 1229 (quoting *Vissenberg v. Bresnahen*, 202 P.2d 663, 669-70 (Wyo. 1949)).

[¶36]   Plaintiffs' unrefuted evidence establishes that the Goulds transferred title to the JF brand to Mr. Ochsner under circumstances that imposed an absolute duty on him to return the property, and Plaintiffs thus proved the first two elements of their conversion claim—

that the Goulds had title to the JF brand and had the right to possess the brand at the time of its conversion. Moreover, given that the parties agreed to a temporary transfer of the JF brand to allow Mr. Ochsner to run cattle carrying that brand on his federal allotments, and Mr. Ochsner has now sold those cattle, the Goulds are entitled to the return of and possession of the brand. Finally, Mr. Ochsner has refused Plaintiffs' demands for the brand's return, thereby exercising dominion over the property in a manner that denies the Goulds the right to use and enjoy it. Plaintiffs have thus proven their conversion claim and are entitled to the return of the JF brand. *See Cross*, 7 P.3d at 930 (cause of action for conversion accrues when defendant's permissive use of plaintiff's property ends).

[¶37] Our standard of review reflects our reluctance to reverse a trial court's findings and conclusions. Based on our review of the record before us, however, we are left with a definite and firm conviction that a mistake has been made. Erin Gould's testimony concerning the JF brand was corroborated and went uncontested at trial. Moreover, Defendants presented no evidence regarding the circumstances surrounding the transfer of the JF brand, and we are thus left with no evidence from which to draw inferences favorable to Defendants. Because the district court's ruling denying Plaintiffs' conversion claim for the JF brand is contrary to the unrefuted evidence, we find it clearly erroneous and reverse the ruling.[7]

## C.   The W.R.C.P. 15(b) Motion to Amend Complaint

[¶38] At the close of their case, Plaintiffs moved pursuant to W.R.C.P. 15(b) to amend their complaint to conform to the evidence and to add a claim for promissory estoppel. The claim related to a promise that Mr. Ochsner allegedly made to induce Plaintiffs to remain on the Ranch when the Goulds, in 2008, informed Mr. Ochsner that they had purchased land in Saratoga, Wyoming and planned to move from the Ranch. Defendants objected, and the district court denied Plaintiffs' motion, finding that while Defendants did not formally object to the Plaintiffs' evidence concerning the 2008 promise, Defendants' earlier motion to dismiss/motion for judgment on the pleadings during Erin Gould's testimony served as an objection to unpleaded claims. Plaintiffs contend that the district court abused its discretion in denying their W.R.C.P. 15(b) motion.

[¶39] The decision to allow a W.R.C.P. 15(b) amendment to pleadings is vested within the sound discretion of the district court and is therefore subject to reversal only for an

---

[7] Defendants argue on appeal that Plaintiffs' conversion claim must be rejected because the entirety of the parties' agreement is contained within the bill of sale transferring the JF brand from the Goulds to the Ranch, and the parol evidence rule precludes consideration of extrinsic evidence to deviate from that agreement. This Court has repeatedly held that it will not consider issues raised for the first time on appeal. *See Miller v. Beyer*, 2014 WY 84, ¶ 34, 329 P.3d 956, 967 (Wyo. 2014) (citing cases). Defendants did not object to the evidence at trial on grounds of the parol evidence rule, and the record does not otherwise indicate that Defendants raised this issue before the district court. We therefore do not address this issue.

14

abuse of discretion. *Johnson v. Sikorski*, 2004 WY 137, ¶ 12, 100 P.3d 420, 423 (Wyo. 2004) (citing *Ekberg v. Sharp*, 2003 WY 123, ¶ 9, 76 P.3d 1250, 1253 (Wyo. 2003)). "Our touchstone inquiry in determining whether a court abused its discretion is whether the trial court could have reasonably concluded as it did." *Lavitt v. Stephens*, 2015 WY 57, ¶ 13, 347 P.3d 514, 518 (Wyo. 2015).

[¶40] Rule 15(b) of the Wyoming Rules of Civil Procedure states,

> When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment. . . . If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice the party in maintaining the party's action or defense upon the merits.

[¶41] Pursuant to W.R.C.P. 15(b), we must consider whether a new issue was tried by express or implied consent of the parties. *Johnson*, ¶ 15, 100 P.3d at 424. We have said:

> A party who knowingly acquiesces in the introduction of evidence relating to issues that are beyond the pleadings is in no position to contest a motion to conform. Thus, consent generally is found when evidence is introduced without objection[.]

*J Bar H, Inc. v. Johnson*, 822 P.2d 849, 856 (Wyo. 1991).

[¶42] Although implied consent may generally be found when evidence relating to issues beyond the pleadings is introduced without objection, "implied consent cannot be based on the introduction of evidence that is relevant to an issue already in the case where there is no indication that the party presenting the evidence intended to raise a new issue." *Green Country Food Mkt., Inc. v. Bottling Grp, LLC*, 371 F.3d 1275, 1280 (10th Cir. 2004).[8] Further,

---

[8] "Because of the similarities between federal and Wyoming rules of civil procedure, we look to federal authority interpreting a particular rule as an aid in applying the comparable Wyoming rule." *Graus v. OK*

> Whether the parties recognized that the unpleaded issue entered the case at trial often depends on whether the evidence that supports the unpleaded issue is also relevant to another issue in the case. If the evidence that supports the unpleaded issue is also relevant to another issue in the case, the introduction of this evidence may not be used to show consent to trial of a new issue absent a clear indication that the party who introduced the evidence was attempting to raise a new issue.

*Triad Elec. & Controls v. Power Sys. Eng'g*, 117 F.3d 180, 194 (5th Cir. 1997); *see also Jeffries v. Tulsa County Bd. of County Comm'rs*, 17 Fed. Appx. 952, 954 (10th Cir. 2001) ("Rule 15(b) does not apply when evidence raised at trial is relevant to other issues already being tried.").

[¶43] We turn then to the district court's exercise of discretion in denying Plaintiffs' W.R.C.P. 15(b) motion. In particular, we must determine whether the record supports a finding that Defendants impliedly consented to try the unpleaded promissory estoppel claim or otherwise supports a finding that the district court abused its discretion in denying the motion.

[¶44] Plaintiffs introduced evidence relating to their promissory estoppel claim on the first day of trial. Erin Gould testified, without objection, that the Goulds had bought property in Saratoga, with plans to move there. The district court then admitted, without objection, Plaintiffs' Exhibits 132, 287, and 289, which were the warranty deed for the Saratoga property and building plans the Goulds had purchased for the house they planned to build on the Saratoga property. Erin Gould then testified:

> Q. Now, during the time period that you were buying this property or that [you] had bought this property, had you talked to Mr. Ochsner about your intentions of leaving the ranch?
> A. Yes.
> Q. So you had – you would have earned a bonus the next year. Why were you going to leave the ranch?
> A. Well, like I said, you know, Jim was kind of beat up and we didn't know for sure that we were going to get that million dollar bonus. And we wanted to – my kids were

*Invs., Inc.*, 2014 WY 166, ¶ 14, 342 P.3d 365, 369 (Wyo. 2014) (quoting *Bratton v. Blenkinsop* (*In re Bratton*), 2014 WY 87, ¶ 24, 330 P.3d 248, 253, n. 6 (Wyo. 2014)).

getting ready to go into high school. They were in high school, my oldest boy.

And Dan came by one time visiting our house. He came to visit, and we had dinner, and then afterwards we told him, you know, we started saying, We bought this property in Saratoga and we would like to build a house and we're planning on moving.

* * *

I can – a few days later, or I am not quite sure, but it was after that that he came to us and said that he wanted to give us the cattle and he wanted to give us cattle as an incentive for us to stay there, and also he would still continue to give us the million dollar bonus.

[¶45] Erin Gould further testified concerning Mr. Ochsner's delivery of a bill of sale transferring sixty head of cattle to Erin and her children:

> Q. Okay. And what did [Mr. Ochsner] tell you? Did he tell – what did he – did he say anything about why he was doing this?
> A. It was an incentive for us to stay, that he was very happy with all the work, all that we had done for him, and so he gave us the cattle. And he would still give us the million dollar bonus. He was very clear on that.

[¶46] On cross examination, Erin Gould again testified to Mr. Ochsner's alleged 2008 promise. During this examination, defense counsel elicited testimony from Erin Gould that because of her husband's disabling injuries, the 2002 personal services agreement no longer applied and was not a basis for recovery of the million dollar bonus—that the basis for Plaintiffs' claim to the million dollar bonus was instead Mr. Ochsner's alleged 2008 promise. At this point in Erin Gould's testimony, defense counsel moved to dismiss, arguing:

> [Defense Counsel]: I move for a nonsuit, your Honor. [Plaintiffs] sued on a contract that [Erin Gould] has now just admitted on the stand she knew didn't exist at the time of the Complaint.
> * * *
> [Plaintiffs' Counsel]: Well, your Honor, she's testified about what we're suing over, what [Mr. Ochsner] said. [She] said that he came to them in 2008, and gave them cows and asked them to stay. You've seen the house plans. We have a deed, and that that is why they stayed on the ranch.

17

[Defense Counsel]: And that's a different lawsuit. I asked her where that's in [the Complaint], that in 2008, they renegotiated, came to a new agreement, and we're suing for breach of that agreement.

It's not before the Court, your Honor. If they have a new complaint, let them file it. This one is gone.

[¶47] The district court denied Defendants' motion for non-suit, but it also denied Plaintiffs' motion to amend the pleadings to allow a claim for promissory estoppel, finding that Defendants' motion acted as an objection to consideration of evidence related to the unpleaded claim. We find no abuse of discretion in this ruling.

[¶48] First, we find little in Erin Gould's testimony that should have alerted Defendants that a new claim, one for promissory estoppel, was being tried. The elements of promissory estoppel are:

> (1) the existence of a clear and definite promise which the promisor should reasonably expect to induce action by the promisee; (2) proof that the promisee acted to its detriment in reasonable reliance on the promise; and (3) a finding that injustice can be avoided only if the court enforces the promise.

*Redland*, ¶ 91, 288 P.3d at 1194 (quoting *Parkhurst v. Boykin*, 2004 WY 90, ¶ 21, 94 P.3d 450, 460 (Wyo. 2004)).

[¶49] Erin Gould testified to the existence of a promise, the first element of promissory estoppel, but our review of the record reveals no testimony concerning the second and third elements. Erin Gould did not testify concerning lost opportunities related to the Saratoga property or how Plaintiffs were otherwise damaged or suffered a detriment by acting in reliance on Mr. Ochsner's alleged 2008 promise. Erin Gould's testimony alone was therefore an insufficient basis to find Defendants' implied consent to try the promissory estoppel claim. Additionally, by Plaintiffs' own admission, evidence relating to the unpleaded promissory estoppel claim was relevant to and overlapped with the pleaded claims. When arguing Plaintiffs' Rule 15(b) motion at trial, Plaintiffs' counsel stated that the promissory estoppel claim "is not that much different than what is pled," and in their brief on appeal, Plaintiffs assert that evidence relating to their requested W.R.C.P. 15(b) amendment was "directly relevant to Counts I [and] III–VII of the Appellants' Complaint" and also "overlaps with the claim on the cattle." Under these circumstances, we can find no abuse of discretion in the district court's determination that Defendants did not impliedly consent to trial of the unpleaded promissory estoppel claim.

[¶50]  It is also apparent from the record that Defendants would have been prejudiced by the late-hour addition of the promissory estoppel claim.  In objecting to Plaintiffs' Rule 15(b) motion, Defense counsel pointed out, and Plaintiffs' counsel conceded, that the documents related to the Saratoga property and the Goulds house plans were not produced to Defendants until two weeks before trial.  Because of the late disclosure of the promissory estoppel claim, Defendants had no opportunity to conduct discovery into the claim and in particular to explore Plaintiffs' claims related to the Saratoga property and any alleged reliance damages related to that property.  S*ee Hoiness-LaBar Ins. v. Julien Constr. Co.*, 743 P.2d 1262, 1268 (Wyo. 1987) (stating that prejudice to the adverse party is the basic guideline when determining the propriety of an amendment subject to this review).

[¶51]  We find no abuse of discretion in the district court's denial of Plaintiffs' W.R.C.P. 15(b) motion to amend.

## D.    The Settlement Agreement

[¶52]  The final issue we must address is Plaintiffs' challenge to the district court's ruling on their motion to enforce a settlement agreement between the parties. The district court held an evidentiary hearing on Plaintiffs' motion, and then issued an order denying the motion.  In so ruling, the district court concluded:

> This Court finds that there was no agreement made between the parties since the written Settlement was not signed by Defendants, nor have the terms been agreed upon.  Secondly, there was no meeting of the minds on the evening of February 3, 2012 when Plaintiffs signed the Settlement.

[¶53]  We review a court's ruling on the enforceability of a settlement agreement as follows:

> The question of whether a contract has been formed is a question of fact, and the district court's determination on that question will not be reversed unless clearly erroneous. *In re Estate of Maycock*, 2001 WY 103, ¶¶ 10-11, 33 P.3d 1114, 1117 (Wyo.2001).  "A settlement agreement is a contract and, therefore, subject to the same legal principles that apply to any contract."  *Id*. at ¶ 10; *see also In re Estate of McCormick*, 926 P.2d 360, 361 (Wyo.1996). We apply the following standard in reviewing whether the district court's determination as to the existence of a settlement agreement was supported by sufficient evidence:

> [O]n appeal, the Supreme Court assumes that evidence in favor of the successful party is true, leaves out of consideration entirely the conflicting evidence presented by the unsuccessful party, and gives the evidence of the successful party every favorable inference that may reasonably and fairly be drawn from it. Furthermore, a reviewing court cannot substitute its judgment of the facts for that of the trial court unless the trial court's judgment is clearly erroneous or contrary to the great weight of the evidence.

*Simek v. Tate*, 2010 WY 65, ¶ 19, 231 P.3d 891, 898 (Wyo. 2010) (quoting *McCormick*, 926 P.2d at 362; *Wyoming Sawmills v. Morris*, 756 P. 2d 774, 775 (Wyo. 1988)).

[¶54] "The elements [of a settlement agreement] are the same as the elements of any contract: offer, acceptance, and consideration, and establishment of the existence of these elements leads courts to conclude that mutual assent has occurred." *Dobson v. Portrait Homes, Inc.*, 2005 WY 95, ¶ 9, 117 P.3d 1200, 1204 (Wyo. 2005) (citing *McCormick*, 926 P.2d at 362); *see also Givens v. Fowler*, 984 P.2d 1092, 1096 (Wyo. 1999). Therefore, an unconditional, timely acceptance of an offer, properly communicated to the offeror, constitutes a meeting of the minds and establishes an enforceable settlement agreement. *Wyoming Sawmills*, 756 P.2d at 775. We have further stated:

> In general, the principle is well settled that where the parties to a contract intend that it shall be closed and consummated prior to the formal signing of a written draft, the terms having been mutually understood and agreed upon, the parties will be bound by the contract actually made, although it be not reduced to writing; but, on the other hand, if the parties do not intend to close the contract until it shall be fully expressed in a written instrument properly attested, then there will be no complete contract until the agreement shall be put into writing and signed. *Summers v. Mutual Life Ins. Co.*, 12 Wyo. 369, 75 P. 937, 943 (Wyo. 1904).

*Wyoming Sawmills*, 756 P.2d at 776.

[¶55] Plaintiffs allege that an enforceable settlement arose from a series of e-mails sent between January 31, 2012 and February 4, 2012. The most critical dates are February 3, 2012 and February 4, 2012, which is when the parties exchanged e-mails that Plaintiffs contend evidence an enforceable agreement. The district court had before it the following e-mails:

February 3, 2012

- 1:58 PM – E-mail from defense counsel to Plaintiffs' counsel – Emphasizing that Mr. Gould needs to be off the property by Sunday.
- 2:01 PM – E-mail from Plaintiffs' counsel to defense counsel – Offering a counteroffer with several terms. Also informed defense counsel that it would be difficult for Mr. Gould to be out by Sunday.
- 2:49 PM – E-mail from defense counsel to Plaintiffs' counsel – Defense counsel called Plaintiffs' counsel's office with no answer. Offers another counter offer for Mr. Gould to take the proceeds from the sale of 160 yearlings. Again, emphasizes that Mr. Gould needs to be off the property by Sunday, February 5th.
- 3:30 PM – E-mail from Plaintiffs' counsel to defense counsel – Draft of the Settlement for defense counsel to review.
- 3:42 PM – E-mail from defense counsel to Plaintiffs' counsel – Offering a number of additional terms.
- 4:41 PM – E-mail form Plaintiffs' counsel to defense counsel – Requesting confirmation of the accuracy of the written agreement.
- 5:26 PM – E-mail from defense counsel to Plaintiffs' counsel – Requesting an additional term.
- 5:58 PM – E-mail from Plaintiffs' counsel to defense counsel – Signed copy of the settlement sent.

February 4, 2012

- 12:32 PM – E-mail from defense counsel to Plaintiffs' counsel – Signed copy of Settlement has been received, but several terms are still unclear and in need of clarification, including:
    1. all yearlings were to be shipped Wednesday;
    2. Mr. Gould would be moved out by Sunday at 10:00 PM;
    3. the brand would be transferred immediately upon the sale of all the cattle that carry such brand;
    4. that Mr. Gould was to feed the cattle until Wednesday to ensure that they were organic; and

21

> 5. only the proceeds from the 160 yearlings will be delivered to Plaintiffs' counsel's trust account.
>
> - 2:52 PM – E-mail from Plaintiffs' counsel to defense counsel – Plaintiffs' counsel disagrees with defense counsel's demands.

[¶56] Plaintiffs argue that the parties achieved a meeting of the minds, thus establishing an enforceable settlement agreement, on February 3, 2012 when Plaintiffs' counsel transmitted a signed settlement document to defense counsel. They further assert that any differences in understanding of the terms at that time were not essential to the bargain and that pursuant to *Wyoming Sawmills*, settlement negotiations were closed and, the terms having been mutually agreed upon, the parties were bound to those terms as represented in the settlement signed by Plaintiffs. We do not agree.

[¶57] The writing signed by Plaintiffs and sent to defense counsel on February 3, 2012, is not written in terms of a document that reflects a final agreement. First the document begins with a statement, "This is to memorialize the agreement between our clients as agreed upon on the 3rd day of February, 2012 please let me know if there are any terms stated incorrectly." Such language does not convey finality but instead suggests that there may be continuing discussions to clarify terms. Additionally, despite the fact that defense counsel had repeatedly emphasized the requirement that the Goulds vacate the Ranch by Sunday, February 5th at 10:00 p.m., Plaintiffs counsel included the following in the written document signed by Plaintiffs:

> The only other issue is the Sunday deadline, Jim is making every effort to be off the ranch. He will be out no later than Wednesday, but he does not have a place to live and will not be able to get into one until Monday or Tuesday at the earliest. I request that you give him and his family until Wednesday the 8th of February.

[¶58] The following afternoon, Saturday, February 4, 2012, defense counsel responded to the e-mailed document by seeking clarification on a number of matters. Of particular importance, defense counsel stated that the February 5th date for Goulds to vacate the ranch was not negotiable and that the JF brand would be transferred after the sale of the cattle carrying that brand, rather than immediately as provided in the writing signed by Plaintiffs. Plaintiffs' counsel responded with a letter characterizing these two terms as unreasonable and refusing to agree to them.

[¶59] From the exchange of writings and e-mails, it is apparent the parties did not have a meeting of the minds on the settlement terms. Additionally, defense counsel testified at the hearing on Plaintiffs' motion to enforce the settlement that the February 3rd writing signed by Plaintiffs did not reflect the terms counsel for the parties had been discussing.

As to whether the disputed terms, when the Goulds would vacate the ranch and when the JF brand would be transferred, were material to the settlement, Mr. Ochsner testified at the hearing that both terms were essential to him. With respect to the timing of the Goulds departure from the ranch, Mr. Ochsner testified to a concern with disruptions to the upcoming cattle sale. With respect to the timing of the brand transfer, Mr. Ochsner testified that he needed to hold the brand title until he had completed the sale of the cattle carrying that brand, and that if he did not have the brand title, he would be unable to sell the cattle.

[¶60] In sum, after examining the record and giving Defendants every favorable inference that may reasonably and fairly be drawn from the evidence, we cannot say that the district court clearly erred in finding that the parties had no meeting of the minds to support the finding of an enforceable settlement agreement. Having so concluded, we need not address the district court's finding that the parties did not intend to have a settlement agreement until the agreement was in writing and signed by all parties.

## CONCLUSION

[¶61] We find that the district court's findings and conclusions regarding the disputed cattle ownership, the W.R.C.P. 15(b) motion, and the settlement agreement were not clearly erroneous, contrary to law, or an abuse of discretion. The district court's findings related to the JF brand were, however, clearly erroneous. We thus affirm in part, reverse in part, and remand for proceedings consistent with our holding herein.

23